*135
 
 OPINION OF THE COURT
 

 Rosenblatt, J.
 

 The questions of law common to the two appeals before us involve public sector arbitration under the Taylor Law. In each appeal the ultimate question is whether the claimed grievance is arbitrable, but the cases raise broader concerns that involve presumptions relating to arbitrability in the public sector, the respective roles of courts and arbitrators, and an examination of this Court’s decision in
 
 Matter of Acting Supt. of Schools of Liverpool Cent. School Dist. (United Liverpool Faculty Assn.)
 
 (42 NY2d 509).
 

 The Watertown Dispute
 

 In this litigation the Watertown City School District and the Watertown Education Association are opponents. The Association is the collective bargaining representative of teachers and other employees in the District. The parties entered into a collective bargaining agreement (CBA) that defined various terms and conditions of employment. It contained provisions relating to health insurance benefits that included the District’s choice of insurance carriers and the percentage breakdown of premium costs allocable to the parties.
 

 Shortly before the CBA went into effect, the District, along with other school districts (including Indian River, the district involved in the companion appeal), entered into a Municipal Cooperation Agreement to provide health insurance benefits for employees of participating districts. The insurance was provided through the Jefferson-Lewis Health Plan, an entity managed by a Board of Trustees comprised of the chief executive officers of the Plan participants, including the Watertown City School District and the Indian River Central School District. Subsequently, owing to financial considerations, the Plan raised the employees’ copayment cap. The Association filed a grievance alleging, in essence, that this change constituted an impermissible, unilateral reduction in employee benefits and a violation of the District’s obligations under the
 
 *136
 
 CBA. After the District denied the grievance, the Association made a demand for arbitration, which the District then sought to stay, claiming that the dispute was not covered by the CBA. The Association cross-moved to compel arbitration.
 

 The CBA contained a broad arbitration clause which provided that “any alleged violation of this Agreement, or any dispute with respect to its meaning or application” was arbitrable. Notwithstanding this language, Supreme Court ruled in favor of the District, granted its application for a stay, and denied the Association’s cross application to compel arbitration, holding that the parties had not agreed to arbitrate the dispute at issue. The Appellate Division affirmed, for reasons stated in the decision at Supreme Court.
 

 The Indian River Dispute
 

 This dispute is identical to
 
 Watertown.
 
 The parties are the School District and the Indian River Education Association (by its President). They entered into a CBA which contained a broad arbitration clause identical to the one in
 
 Watertown.
 
 The Indian River School District acquired health insurance coverage for its members under the same Municipal Cooperation Agreement as in
 
 Watertown.
 
 The
 
 Indian River
 
 CBA also contained a clause setting the percentage breakdown for health insurance premiums allocable to the parties. The case followed a procedural history similar to
 
 Watertown.
 
 Following the District’s denial of the Association’s grievance when the Plan raised the employees’ copayment, the Association sought arbitration, the District resisted it, and Supreme Court, in an order issued the same day as in
 
 Watertown,
 
 ruled with the District. It granted the District’s application for a stay, and in language similar to its holding in
 
 Watertown,
 
 denied the Association’s cross application to compel arbitration. Supreme Court noted that in light of its decision it need not consider whether the Association failed to comply with a condition precedent to arbitration. The Appellate Division affirmed, without opinion, citing
 
 Watertown.
 

 We reverse both Appellate Division orders and direct that both cases proceed to arbitration.
 

 The Taylor Law
 

 Based on their status as employee organizations and public employers (Civil Service Law § 201 [5], [6]), both parties couch their arguments in the context of the Taylor Law (Civil Service Law art 14).
 

 
 *137
 
 In 1967 the State Legislature enacted the Taylor Law,
 
 [1]
 
 which governs labor relations in the public sector. It deals with rights and relationships involved in public employment, such as organizing, collective bargaining, the prohibition of strikes by public employees, and the creation of the Public Employment Relations Board. The Taylor Law contemplates two types of arbitration: compulsory and permissive. The former is found in Civil Service Law § 209 and involves what has been termed “interest arbitration.” This deals, in essence, with terms and conditions of employment not previously agreed upon. Normally those disputed issues are settled by negotiation, but the Legislature provided that if an impasse occurs in collective negotiations involving public employees, the compulsory arbitration provisions of Civil Service Law § 209 come into play (see,
 
 City of New York v Patrolmen’s Benevolent Assn.,
 
 89 NY2d 380, 386-387;
 
 Matter of City of Newburgh v Newman,
 
 69 NY2d 166, 170-171;
 
 see generally,
 
 Anderson and Krouse,
 
 Interest Arbitration: The Alternative to the Strike,
 
 56 Fordham L Rev 153 [1987]; Graver,
 
 The Judicial Enforcement of Public Sector Interest Arbitration,
 
 21 B C L Rev 557 [1980]).
 

 In addition to imposing these obligations, the Taylor Law permits public sector parties to submit CBA grievances to arbitration (Civil Service Law § 204). This species of arbitration — grievance arbitration — is at issue in this case. The question whether a particular grievance is arbitrable under the Taylor Law has occupied the courts of this State in scores of cases over the last three decades
 
 (see also,
 
 Coleman,
 
 Grievance Arbitration in the Public Sector: Status, Issues and Problems,
 
 17 J Collective Negotiations 89 [1988]).
 

 The Liverpool Two-Step Format
 

 In 1977 this Court decided
 
 Matter of Acting Supt. of Schools of Liverpool Cent. School Dist. (United Liverpool Faculty Assn.)
 
 (42 NY2d 509,
 
 supra),
 
 which established criteria for determining whether and when a particular public sector grievance is subject to arbitration.
 

 The
 
 Liverpool
 
 protocol entails a two-step inquiry. Initially the court must determine whether arbitration claims with respect to the particular subject matter are authorized by the
 
 *138
 
 terms of the Taylor Law. The second step involves “a determination of whether such authority was in fact exercised and whether the parties did agree by the terms of their particular arbitration clause to refer their differences in this specific area to arbitration”
 
 (Matter of Acting Supt. of Schools of Liverpool Cent. School Dist. [United Liverpool Faculty Assn.], supra,
 
 at 513). Succinctly, the test centers on two distinct inquiries as to the public parties’ purported entry into the arbitral forum: may they do so and, if yes, did they do so.
 

 Liverpool’s First Step
 

 The first (“may-they-do-so”) step calls for an examination, by the court, of the subject matter of the dispute. Drawing on earlier decisions that discussed the lawfully permissible scope of arbitrability (see,
 
 Matter of Cohoes City School Dist. v Cohoes Teachers Assn.,
 
 40 NY2d 774;
 
 Matter of Susquehanna Val. Cent. School Dist. [Susquehanna Val. Teachers’ Assn.],
 
 37 NY2d 614, 616-617), the Court in
 
 Liverpool
 
 pointed out that owing to public policy or to statutory or constitutional restrictions there are certain matters that are off-limits for arbitration. Although this inquiry deals with whether the parties may arbitrate, it typically involves an assertion by the public employer that it may not or should not lawfully submit itself to a particular grievance arbitration. The inquiry is less concerned with the wording of the parties’ intent to arbitrate than with the lawfulness of that intent.
 

 Commentators have described this concern as having been born of a number of factors, including a reluctance to deprive the government of what has been its ultimate decision-making prerogatives
 
 (see,
 
 Abrams,
 
 Symposium: Governance of Public Enterprises: The Power Issue in Public Sector Grievance Arbitration,
 
 67 Minn L Rev 261, 271 [1982]) or to otherwise allow sovereign authority to be delegated away
 
 (see generally,
 
 Graver,
 
 The Judicial Enforcement of Public Sector Grievance Arbitration,
 
 58 Tex L Rev 329, 338 [1980]; Hodges,
 
 Symposium on Labor Arbitration Thirty Years After the Steelworkers Trilogy: The Steelworkers Trilogy in the Public Sector,
 
 66 Chi-Kent L Rev 631, 640 [1990]; Comment:
 
 Developments in the
 
 Law—
 
 Public Employment,
 
 97 Harv L Rev 1611, 1718-1726 [1984]; Annotation,
 
 Bargainable or Negotiable Issues in State Public Employment Labor Relations,
 
 84 ALR3d 242; Annotation,
 
 Validity and Construction of Statutes or Ordinances Providing For Arbitration of Labor Disputes Involving Public Employees,
 
 68 ALR3d 885, 928).
 

 In the 22 years following
 
 Liverpool,
 
 however, this Court has
 
 *139
 
 overwhelmingly rejected contentions by public employers that particular issues fall outside the scope of permissible grievance arbitration
 
 (e.g., Matter of Committee of Interns & Residents [Dinkins],
 
 86 NY2d 478, 483-484 [City’s malpractice insurance coverage obligation];
 
 Matter of Board of Educ. [Connetquot Teachers Assn.],
 
 60 NY2d 840 [right of teachers’ association to use of office space in school building];
 
 Board of Educ. v Glaubman,
 
 53 NY2d 781 [employee’s right to be rehired on basis of seniority];
 
 Matter of United Liverpool Faculty Assn. v Board of Educ.,
 
 52 NY2d 1038 [evaluation of teacher];
 
 Matter of Franklin Cent. School [Franklin Teachers Assn.],
 
 51 NY2d 348 [grievance of nonteaching employee under teachers’ collective bargaining agreement];
 
 Board of Educ. v Barni,
 
 49 NY2d 311 [violation of disciplinary provisions as to probationary teacher];
 
 Board of Educ. v Patchogue-Medford Congress of Teachers,
 
 48 NY2d 812 [denial of sabbatical leave or summer study grants];
 
 Matter of Wyandanch Union Free School Dist. v Wyandanch Teachers
 
 Assn., 48 NY2d 669 [School Board’s failure to submit change in educational policy to advisory professional council; and whether certain duties were properly imposed upon teachers];
 
 Matter of Triborough Bridge & Tunnel Auth. [Bridge & Tunnel Officers Benevolent Assn.],
 
 44 NY2d 676 [compensation for peace officer relating to off-duty arrest];
 
 Matter of South Colonie Cent. School Dist. v Longo,
 
 43 NY2d 136 [dispute involving no-reprisal clause in agreement]).
 

 This is not to say that the concept of public policy (or statutory or constitutional) restrictions on public sector arbitration are extinct. To be sure, there are instances in which arbitration has been prohibited
 
 (e.g., Matter of Blackburne [Governor’s Off. of Empl. Relations],
 
 87 NY2d 660 [termination of State agency employee for violation of Hatch Act];
 
 Honeoye Falls-Lima Cent. School Dist. v Honeoye Falls-Lima Educ. Assn.,
 
 49 NY2d 732 [seniority dispute involving adequate academic standards];
 
 Board of Educ. v Areman,
 
 41 NY2d 527 [Board accessibility to teachers’ personnel files];
 
 Matter of Cohoes City School Dist. v Cohoes Teachers Assn.,
 
 40 NY2d 774 [tenure decisions], sup
 
 ra; see also, Matter of Sprinzen [Nomberg],
 
 46 NY2d 623, 630 [cataloging nonarbitrable issues as a matter of public policy, including punitive damage awards, claims concerning insolvent insurance companies, usury determinations, and antitrust issues]). Moreover, our courts have vacated arbitral awards or portions thereof as having been against public policy
 
 (see, Matter of Cohoes City School Dist. v Cohoes Teachers Assn.,
 
 40 NY2d 774 [tenure decision],
 
 supra).
 

 In all, however, the decisional law reflects the reality of
 
 *140
 
 greatly increased public sector arbitration, and its acceptance, compatible with the government’s public policy concerns (see
 
 generally, Matter of Professional, Clerical, Tech. Empls. Assn. [Buffalo Bd. of Educ.],
 
 90 NY2d 364; Coleman,
 
 Grievance Arbitration in the Public Sector: Status, Issues and Problems,
 
 17 J Collective Negotiations 89 [1988]).
 

 Liverpool’s Second Step
 

 If the first step is scaled, and the subject matter declared lawfully fit for arbitration, the
 
 Liverpool
 
 protocol next calls for a determination as to whether the parties agreed to arbitrate the grievance. The second (“did-they-do-so”) step invokes the sort of conventional judicial analysis that is influenced by the wording of the CBA. Descending from the higher reaches of public policy, this step typically turns on drafting skills and language entirely within the control of the parties.
 

 Here, too, in the vast majority of post
 
 -Liverpool
 
 cases, this Court has determined that the public sector parties had, by the broad arbitration clause language of the collective bargaining contracts, agreed to arbitrate the particular grievances involved (e.g.,
 
 Matter of Committee of Interns & Residents [Dinkins],
 
 86 NY2d 478,
 
 supra; Matter of Board of Educ. v Connetquot Teachers Assn.,
 
 60 NY2d 840, 841,
 
 supra; Board of Educ. v Glaubman,
 
 53 NY2d 781,
 
 supra; Matter of Franklin Cent. School [Franklin Teachers Assn.],
 
 51 NY2d 348,
 
 supra; Board of Educ. v Barni, 49
 
 NY2d 311,
 
 supra; Matter of Wyandanch Union Free School Dist. v Wyandanch Teachers
 
 Assn., 48 NY2d
 
 669, supra; Matter of Board of Educ. v Roosevelt Teachers Assn.,
 
 47 NY2d 748;
 
 Matter of Triborough Bridge & Tunnel Auth. [Bridge & Tunnel Officers Benevolent Assn.], 44
 
 NY2d 676,
 
 supra; but see, Matter of South Colonie Cent. School Dist. [South Colonie Teachers Assn.],
 
 46 NY2d 521, 525).
 

 This case catalog is revealing. It not only speaks to the litigational aftermath of the two
 
 Liverpool
 
 steps, but also sheds light on an additional theme in
 
 Liverpool,
 
 notably, the approach in evaluating the
 
 intention
 
 of the parties with regard to public sector arbitration.
 

 Liverpool and Presumptions Regarding Arbitrability
 

 In 1960, 17 years before
 
 Liverpool,
 
 the United States Supreme Court decided
 
 Steelworkers v Warrior & Gulf Co.
 
 (363
 
 *141
 
 US 574)
 
 [2]
 
 — a case that involved private sector parties and a Federal statute — in which it adopted a “presumption of arbitrability.” The Supreme Court observed that the Federal Labor Management Relations Act of 1947 (29 USC § 141
 
 et seq.)
 
 was imbued with a congressional policy in favor of arbitration to resolve labor disputes and that courts should interpret arbitration clauses accordingly, “unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage”
 
 (Steelworkers v Warrior & Gulf Co., supra,
 
 at 582-583). This has been a consistent theme in Federal labor law cases (see,
 
 e.g.,AT&T Technologies v Communications Workers,
 
 475 US 643 [1986];
 
 but see, Wright v Universal Mar. Serv. Corp.,
 
 525 US 70 [1998]).
 

 In
 
 pre-Liverpool
 
 cases that involved the application of Federal law, this Court applied the
 
 Steelworkers
 
 “presumption of arbitrability”
 
 (e.g., Matter of Howard & Co. v Daley,
 
 27 NY2d 285;
 
 Matter of Fitzgerald [General Elec. Co.],
 
 19 NY2d 325). Emphasizing, however, the relatively brief acquaintance that the State had with Taylor Law grievance arbitration, and lacking an adequate, reassuring experience, the Court, in
 
 Liverpool,
 
 expressed hesitancy over the prospect of prematurely expanding the arbitral portals in public sector cases.
 

 In
 
 Liverpool
 
 the Court emphasized that arbitration did “not yet carry the same historical or general acceptance” or “demonstration of * * * efficacy” in the public sector as it did in the private sector
 
 (Matter of Acting Supt. of Schools of Liverpool Cent. School Dist. [United Liverpool Faculty Assn.], supra,
 
 at 513) . In the absence of unequivocal agreement to the contrary, it was to be taken that a public employer, being charged with nondelegable responsibilities, did
 
 not
 
 intend to arbitrate grievances
 
 (Matter of Acting Supt. of Schools of Liverpool Cent. School Dist. [United Liverpool Faculty Assn.], supra,
 
 at 513-514) .
 

 That was 1977, and it epitomized a wait-and-see attitude. We have waited, and we have seen. Arbitration in the public arena is no longer unfamiliar or unaccepted. It is a reality, and it is widespread.
 

 The enormous growth in the use of collective bargaining agreements has generated vast experience in drafting arbitra
 
 *142
 
 tion clauses. Public sector parties may now use phrases that have been litigated into familiarity. They are free to negotiate language that will define disputes in areas of the broadest permissible scope. Parties are likewise free to negotiate exclusions, and to word arbitration clauses with sufficient clarity for a court to be able to tell, on a threshold determination, whether they intended a permissible subject or type of dispute to be arbitrable or not.
 

 Liverpool did not expressly create a “presumption”
 
 against
 
 public sector arbitrability. To the extent, however, that one may be implied or fairly so characterized, an anti-arbitrational presumption is no longer justified either in law, or in the public sector labor environment. The lengthy chronicle of this Court’s cases after
 
 Liverpool
 
 proclaims as much, as does the huge increase of public sector arbitration over the last quarter century.
 

 'Liverpool’s
 
 approach calls for a two-step analysis necessary in public sector arbitrations which, by its nature involves concerns of public policy not at issue in
 
 Steelworkers.
 
 We will stay with the
 
 Liverpool
 
 format because it has been workable
 
 for
 
 over two decades, with results that have largely comported with the
 
 Steelworkers
 
 presumption with respect to CBA interpretation. We will preserve the two-step
 
 Liverpool
 
 analysis for judicial threshold consideration, free of any presumptions.
 
 [3]
 

 Merits Considerations by the Courts
 

 It is also clear that the merits of the grievance are not the courts’ concern
 
 (Matter of Board of Educ. v Watertown Educ. Assn.,
 
 74 NY2d 912, 913;
 
 see generally,
 
 Siegel, New York Practice § 589, at 945 [2d ed]). Even an apparent weakness of the claimed grievance is not a factor in the court’s threshold determination. It is the arbitrator who weighs the merits of the claim
 
 (see, Matter of Franklin Cent. School [Franklin Teachers Assn.],
 
 51 NY2d 348, 356,
 
 supra).
 
 CPLR 7501 explicitly provides: “In determining any matter arising under this article, the court shall not consider whether the claim with respect to which arbitration is sought is tenable, or otherwise pass upon the merits of the dispute.” This was added by section 47 of chapter 532 of the Laws of 1963 for the purpose of abrogating
 
 *143
 
 what was left of the so-called
 
 “Cutler-Hammer”
 
 rule
 
 (Matter of International Assn. of Machinists [Cutler-Hammer, Inc.],
 
 297 NY 519), in which our courts had taken a more expansive view of the merits, in determining arbitrability.
 

 While some case records contain enough information for a court to make a penetrating analysis of the scope of the substantive provisions of the CBA, an undertaking of that kind is not the function of the court. A judicial inquiry of that sort would involve an inapt flirtation with the merits, or an inappropriate use of the judicial scalpel to split the hairs that mark the perimeters of the contractual provisions. History, legislation, and experience dictate that courts not revert to the business of merits inquiries of the kind that existed under the
 
 Cutler-Hammer
 
 doctrine before the enactment of CPLR 7501.
 

 The “Reasonable Relationship” Test
 

 In the two cases before us, there is no dispute as to the first step. Both sides have recognized the subject matter as arbitrable. As for the second step, the courts below assessed the Associations’ claims and ruled that they were not arbitrable. In both cases, and in the face of broad arbitration clauses, they addressed the nature of the dispute, and, acting as would an arbitrator, interpreted the scope of the substantive provision of the contract. They then found the grievances to be outside of the parties’ agreement to arbitrate. This was error. A court confronted with a contest of this kind should merely determine whether there is a reasonable relationship between the subject matter of the dispute and the general subject matter of the CBA. If there is none, the issue, as a matter of law, is not arbitrable. If there is, the court should rule the matter arbitrable, and the arbitrator will then make a more exacting interpretation of the precise scope of the substantive provisions of the CBA, and whether the subject matter of the dispute fits within them (see,
 
 Board of Educ. v Barni,
 
 49 NY2d 311,
 
 supra; see also, Matter of Nationwide Gen. Ins. Co. v Investors Ins. Co.,
 
 37 NY2d 91, 95).
 

 The parties in the cases before us chose to arbitrate any alleged violation of the CBA or any dispute with respect to its meaning or application. Given a clause of this breadth, and the presence of language dealing specifically with health insurance benefits, we determine that the reduction of benefits by increasing the employees’ copayments was an arbitrable issue. We reach this conclusion even though, as the District stresses, it was the Plan, a nonparty, that reduced the benefits. The Districts assert that even though the Plan is governed by a
 
 *144
 
 Board of Trustees comprised of District CEOs, the Districts do not control the amount or type of health insurance benefits that the Plan provides. Whether this is so, and whether the District violated the CBA with regard to maintaining a certain level of benefits, is for the arbitrator
 
 (Matter of Board of Educ. v Deer Park Teachers Assn.,
 
 50 NY2d 1011;
 
 Board of Educ. v Barni,
 
 49 NY2d 311,
 
 supra; see also, Matter of American Bosch Arma Corp. [Stewart],
 
 15 NY2d 840).
 

 We have considered Indian River Central School District’s remaining argument in support of a stay of arbitration, and find it to be without merit.
 

 Accordingly, in each proceeding, the order of the Appellate Division should be reversed, with costs, the petition to stay arbitration denied and the cross application to compel arbitration granted.
 

 Chief Judge Kaye and Judges Bellacosa, Smith, Levine, Ciparick and Wesley concur.
 

 In each proceeding: Order reversed, etc.
 

 [1]
 

 . Officially, the Public Employees’ Fair Employment Act (L 1967, ch 392), named after George W. Taylor of the University of Pennsylvania, whom Governor Nelson Rockefeller named to chair a committee on employee relations. The committee report, published in 1966, was the basis for the Taylor Law (see
 
 generally,
 
 Donovan, Administering the Taylor Law, at 24 [1988]).
 

 [2]
 

 . This case was part of what came to be known as the
 
 Steelworkers
 
 trilogy, the other two cases being
 
 Steelworkers v Enterprise Corp.
 
 (363 US 593) and
 
 Steelworkers v American Mfg. Co.
 
 (363 US 564).
 

 [3]
 

 . We note that in
 
 Wright v Universal Mar. Serv. Corp.
 
 (525 US 70 [1998],
 
 supra),
 
 the United States Supreme Court refused to apply the presumption of arbitrability in a case that involved the interpretation of a Federal statute.