854 A.2d 342

CAMDEN BOARD OF EDUCATION, PLAINTIFF–APPELLANT AND
CROSS–RESPONDENT, v. NELSON ALEXANDER; JUAN
DIAZ; HERMINIO FEBRES; DAVID SIMS; LAWRENCE
HACKETT; JAMES BRADLEY; WESLEY CONSTON; WIL-
·LIAM HEDGEBETH; ANDRE MOODY; ANGEL PAGAN; ER-
NESTO SANTIAGO; LARRY WILLIAMS; DEREK COPELAND;
ROBERT HAWKINS; CHARLES SMITH AND COMMUNICA-
TIONS WORKERS OF AMERICA, AFL–CIO, DEFENDANTS–
RESPONDENTS AND CROSS–APPELLANTS.

Argued September 8, 2003—Decided August 12, 2004.

*Thomas M. Toman, Jr.* argued the cause for appellant and cross-respondent (*Murray & Murray,* attorneys; *Mr. Toman* and *Karen A. Murray,* of counsel and on the briefs).

*Steven P. Weissman* argued the cause for respondents and cross-appellants (*Weissman & Mintz,* attorneys). *John J. Burns,* Assistant Counsel, argued the cause for amicus curiae New Jersey School Boards Association (*Cynthia J. Jahn,* General Counsel, attorney). *Steven R. Cohen* argued the cause for amicus curiae New Jersey Education Association (*Selikoff & Cohen,* attorneys; *Carol H. Alling,* on the brief).

*John J. Burns,* Assistant Counsel, argued the cause for amicus curiae New Jersey School Boards Association (*Cynthia J. Jahn,* General Counsel, attorney).

*Steven R. Cohen* argued the cause for amicus curiae New Jersey Education Association (*Selikoff & Cohen,* attorneys; *Carol H. Alling,* on the brief).

Justice LaVECCHIA delivered the opinion of the Court.

The Camden Board of Education (Board) voted not to renew certain custodians and mechanics (defendants) at the conclusion of the 1999–2000 school year. Defendants sought to arbitrate the non-renewal of their appointments under the grievance provision of the applicable collective negotiation agreement (CNA). The question before the Court is whether arbitration should be permitted.

## I.

In enacting Title 18, the Legislature set up a scheme for the employment of school personnel. Included therein is *N.J.S.A.* 18A:27–4.1, which provides:

Notwithstanding the provisions of any law, rule or regulation to the contrary.

\* \* \*

b. A board of education shall renew the employment contract of a certificated or non-certificated officer or employee only upon the recommendation of the chief school administrator and by a recorded roll call majority vote of the full membership of the board. The board shall not withhold its approval for arbitrary and capricious reasons. A non-tenured officer or employee who is not recommended for renewal by the chief school administrator shall be deemed nonrenewed. Prior to notifying the officer or employee of the non-renewal, the chief school administrator shall notify the board of the recommendation not to renew the officer's or employee's contract and the reasons for the recommendation. An officer or employee whose employment contract is not renewed shall have the right to a written statement of reasons for non-renewal pursuant to section 2 of P.L.1975, c. 132 (C.18A:27–3.2) and to an informal appearance before the board. The purpose of the appearance shall be to permit the staff member to convince the members of the board to offer reemployment. The chief school administrator shall notify the officer or employee of the non-renewal pursuant, where applicable, to the provisions of section 1 of P.L.1971, c. 436 (C. 18A:27–10).

The parties agree that that statute does not preempt them from contractually granting greater protection to fixed-term employees by subjecting non-renewals to a just cause requirement, and

submitting non-renewal grievances to binding arbitration. *See also Wright v. Bd. of Ed. of City of E. Orange*, 99 *N.J.* 112, 116, 491 *A.*2d 644 (1985) (holding that *N.J.S.A.* 18A:17–3 did not bar collective negotiations agreement providing tenure rights for fixed-term custodians). Thus, the question—can this matter be negotiated—is not in issue. This case is about whether the parties, in fact, did negotiate for arbitration to apply in this non-renewal setting.

As members of Local 1079 Custodial and Maintenance Employees of the Communications Workers of America, AFL–CIO (Union), defendants were protected by the CNA negotiated by the Union. The CNA's grievance provision, and two related provisions, follow:

Article III: Grievance Procedure

A. Definition

A "Grievance" shall mean a complaint by an employee or the Union that there has been to him/her a personal loss, injury or inconvenience because of a violation, misinterpretation, or misapplication of this Agreement.

B. Procedure

6. (a) The *following procedure* will be used to secure the services of an arbitrator: The Union will make a request to the Public Employment Relations Commission for a panel of arbitrators no later than 45 days after receipt of the Board's decision.

(b) The arbitrator shall limit himself/herself to the issue submitted to him/her and shall consider nothing else. He/she can add nothing to, nor subtract anything from, the Agreement between the parties or any policy of the Board of Education. The recommendations of the arbitrator shall be binding on the parties. Only the Board and the aggrieved and his/her representatives shall be given copies of the arbitrator's report and findings and recommendations. This shall be accomplished within (30) days of the completion of the arbitrator's hearings.[1]

Article IV: Employee Rights

---

[1] Because Article III does not allow "any" or "all" disputes to be submitted to arbitral review, and prevents an arbitrator from adding to or subtracting from the terms of the CNA, it is described as "narrow." *See Communications Workers of Am., Local 1087 v. Monmouth County Bd. of Soc. Servs.*, 96 *N.J.* 442, 449, 476 *A.*2d 777 (1983) (explaining that "language limiting the arbitrator's authority to the resolution of grievances arising out of the terms of the agreement and denying him the authority to add to, or subtract from, or modify its terms is typical of a narrow, as distinguished from a broad, arbitration clause").

A. No employee shall be disciplined or reprimanded without just cause. Any such action asserted by the Board, or any agent or representative thereof, shall be subject to the Grievance Procedure herein set forth.

Article X: Board Rights

C. The Board, subject only to the language of this Agreement reserves to itself full jurisdiction and authority over matters of policy and retains the right, in accordance with applicable laws and regulations.

\* \* \*

b. to hire, promote, transfer, assign and retain employees in positions within the School District, and to suspend, demote, discharge or take other disciplinary action against employees.

Toward the end of the 1999–2000 school year, each defendant received from a supervisor a letter warning that due to excessive absenteeism, "disciplinary action maybe [sic] taken which may include but not be limited to not being recommended for reappointment for the 2000–2001 school year." Thereafter, on the recommendation of the chief school administrator, the Board voted on June 28, 2000, not to renew defendants' appointments. We note that the Board permitted defendants to appear and to be heard prior to its vote. *See N.J.S.A.* 18A:27–4.1b. Each defendant not renewed for the 2000–01 school year then sought to arbitrate the merits of his non-renewal under the CNA's grievance procedures.

Although the Board and Union agreed to waive the preliminary steps of the CNA's grievance procedure and to proceed directly to the arbitration stage of Article III, the Board nonetheless preserved the issue of arbitrability.[2] The Board sought to restrain the arbitrations, initially before the Commissioner of Education, and thereafter in Superior Court. This appeal comes to us by way of the Appellate Division's affirmance, with modification, of the

---

[2] This appeal is distinguishable from the posture of the appeal in *State, Office of Employee Relations v. Communications Workers of America, AFL–CIO,* 154 *N.J.* 98, 109–11, 711 *A.2d* 300 (1998)(*OER* ), where the State waived the threshold issue of substantive arbitrability. Notably, the Court's analysis and holding in that matter were limited by the deferential standard that pertains to review of "the validity of the arbitration award." *Id.* at 111, 711 *A.2d* 300.

Law Division's refusal to restrain arbitration. *Camden Bd. of Educ. v. Alexander,* 352 *N.J.Super.* 442, 450, 800 *A.*2d 250 (2002).[3]

The Appellate Division stated that although employees with fixed-term contracts have no right to continued employment (other than enjoyment of the protections provided by *N.J.S.A.* 18A:27–4.1), such employees "may also be entitled to arbitrate the termination of employment if the employer has negotiated a disciplinary review procedure which includes the right of an untenured employee to arbitrate a termination for misconduct." *Id.* at 447, 800 *A.*2d 250. Finding that to be the case here, the court allowed the arbitrations to proceed but shifted to the fixed-term employee the burden of initially proving "that the termination is a ploy by the employer to avoid the agreed disciplinary review procedures." *Ibid.* (citing *OER, supra,* 154 *N.J.* at 114–15, 711 *A.*2d 300). The panel commented that the warning letter sent to each defendant suggested an attempt by the Board to circumvent the grievance procedure of the CNA by "terminating [defendants] for cause without officially charging the[m] with misconduct." *Id.* at 449, 800 *A.*2d 250. Nonetheless, the court held that each defendant would be required to satisfy the above-described threshold to proceed to arbitration on the merits of the non-renewal. *Id.* at 450, 800 *A.*2d 250.

We granted the parties' respective petition and cross-petition for certification, 175 *N.J.* 77, 812 *A.*2d 1109 (2002), and now reverse.

## II.

The New Jersey Constitution grants public employees "the right to organize, present to and make known to the State, or any of its political subdivisions or agencies, their grievances and proposals through representatives of their choosing." *N.J. Const.* art. I, ¶ 19. Unlike private-sector employees, public employees

---

[3] The record reveals that only one arbitration (Derek Copeland's) went forward during the pendency of the Appellate Division appeal.

are not given the right to "bargain collectively." *Ibid.* Public employees instead may engage in collective negotiations. *N.J. State College Locals v. State Bd. of Higher Educ.,* 91 *N.J.* 18, 25–26, 449 *A.*2d 1244 (1982). *See generally Lullo v. Int'l Ass'n of Fire Fighters,* 55 *N.J.* 409, 436–41, 262 *A.*2d 681 (1970) (discussing distinction between "collective bargaining" and "collective negotiation").

Twenty-five years ago we provided guidelines for courts grappling with the distinct inquiries engendered by public-sector employment disputes. *State v. State Supervisory Employees Ass'n,* 78 *N.J.* 54, 393 *A.*2d 233 (1978); *Township of W. Windsor v. Public Employment Relations Comm'n,* 78 *N.J.* 98, 393 *A.*2d 255 (1978). We resolved that the Public Employment Relations Commission (PERC), and not the courts, was the entity to determine whether, in a public-sector labor dispute, a specific subject is negotiable (the "scope-of-negotiations" determination). *Ridgefield Park Educ. Ass'n v. Ridgefield Park Bd. of Educ.,* 78 *N.J.* 144, 153–56, 393 *A.*2d 278 (1978). However, as noted by the parties and the Appellate Division in this case, there is no "scope" question here. *See Wright, supra,* 99 *N.J.* at 122–23, 491 *A.*2d 644.[4] The issue is whether the parties negotiated to provide for arbitration of the non-renewal of fixed-term employees. That issue is a legal question of contract interpretation for a court to decide: has the CNA made this public-sector dispute substantively arbitrable? *State v. State Troopers Fraternal Ass'n,* 134 *N.J.* 393, 399–400, 634 *A.*2d 478 (1993); *Ridgefield Park, supra,* 78 *N.J.* at 153–55, 393 *A.*2d 278.

---

[4] Thus, *Peninsula School District v. Public School Employees of Peninsula,* 130 *Wash.*2d 401, 924 *P.*2d 13 (1996), cited by the dissent, does not provide persuasive support for the precise issue before us. *Post* at 223–24, 854 *A.*2d at 365. *Peninsula* essentially accords with our decision in *Wright, supra,* 99 *N.J.* at 122–23, 491 *A.*2d 644, in which we held that a school board could negotiate to provide greater protection to its janitorial employees than those mandated by statute. *Peninsula, supra,* 924 *P.*2d at 16–17, 19.

As in the review of public-sector arbitration awards,[5] and in respect of questions concerning the scope of negotiations, *New Jersey State College Locals, supra,* 91 *N.J.* at 26, 449 *A.*2d 1244, legislative expressions of public policy affect our analysis in the present public-sector employment dispute. Here, *N.J.S.A.* 18A:27–4.1 creates its own dispute-resolution mechanism and standard of review governing non-renewal decisions pertaining to fixed-term staff; namely, the Board may non-renew a non-certificated employee for any reason that is not arbitrary or capricious. *Ibid.* As long as the reason for non-renewal is not arbitrary or capricious, the non-renewal is both valid and unassailable. *Ibid.* Absent a specific agreement to the contrary, *N.J.S.A.* 18A:27–4.1 governs the relationship between the parties.

As a general matter, legislative and other regulatory enactments are "a silent factor in every contract[, and p]arties in New Jersey are likewise presumed to have contracted with reference to the existing law." *Silverstein v. Keane,* 19 *N.J.* 1, 13, 115 *A.*2d 1 (1955). In the public-sector-employment context, however, statutory and regulatory provisions serve as more than mere "gap-fillers." Where, as here, a statutory provision confers a prerogative on the public employer in respect of the non-renewal of fixed-term staff, a waiver of that legislatively conferred prerogative should be unmistakable. We have commented before that

---

[5] Our Court has underscored the special significance of public policy as a foundation that governs and circumscribes the decisions of public-sector arbitrators. *OER, supra,* 154 *N.J.* at 112, 711 *A.*2d 300; *Communications Workers, supra,* 96 *N.J.* at 448, 453, 476 *A.*2d 777; *Kearny PBA Local # 21 v. Town of Kearny,* 81 *N.J.* 208, 217, 405 *A.*2d 393 (1979); *New Jersey State Policemen's Benevolent Ass'n, Local 29 v. Town of Irvington,* 80 *N.J.* 271, 288–93, 403 *A.*2d 473 (1979); *City of Atlantic City v. Laezza,* 80 *N.J.* 255, 268–69, 403 *A.*2d 465 (1979); *cf. Weiss v. Carpenter, Bennett & Morrissey,* 143 *N.J.* 420, 429–32, 672 *A.*2d 1132 (1996) (noting that public policy concerns support use of heightened rigor in judicial review of public-sector arbitration awards); *Tretina Printing, Inc. v. Fitzpatrick & Assocs., Inc.,* 135 *N.J.* 349, 364–65, 640 *A.*2d 788 (1994) (stating that "public policy demands that public-sector arbitrator, who must consider effect of decision on the public interest and welfare, issue a decision in accordance with the law").

when a statutory provision has defining import, its application must be negotiated away clearly and unmistakably. *Cf. Red Bank Reg'l Educ. Ass'n v. Red Bank Reg'l High Sch. Bd. of Educ.*, 78 *N.J.* 122, 140, 393 *A.2d* 267 (1978) (finding that "[t]he propriety of a contractual waiver of statutory rights is well-established in the private sector. . . . To be given effect [in that setting], any such waiver must be clearly and unmistakably established, and contractual language alleged to constitute a waiver will not be read expansively").[6] Thus, the question is whether the CNA is specific enough to bring about, in effect, a waiver of the Board's authority under *N.J.S.A.* 18A:27–4.1b in respect of decisions concerning the renewal of its fixed-term employees.

## III.

### A.

To resolve the instant question of contract interpretation, we begin by noting that the CNA's language does not specifically include disciplinary non-renewal, nor does it specifically exclude that subject. *See, e.g., Hanover Twp. Bd. of Educ.*, PERC No. 99–7, 24 *NJPER* ¶ 29191 (1988), *aff'd* A–306–98T2 (1999) (SPA 1999) (restraining arbitration where board and association negotiated grievance procedure that specifically excluded "any matter for which [a] complaint related to the non-renewal or termination on notice of a non-tenure employee's contract")(internal quotation marks omitted). As might be expected, the parties disagree on the scope of the grievance language. Defendants essentially argue that the contract provides that decisions not to renew would be rendered implicitly subject to a good cause requirement by the inclusion of the word "discipline" in the CNA's grievance provision; and that, therefore, any form of disciplinary non-renewal

---

[6] The Court never reached the waiver issue in *Red Bank, supra,* because we held that the issue there involved a non-negotiable "term and condition of employment set by statute [that] may not be modified by negotiated agreement." 78 *N.J.* at 141, 393 *A.2d* 267.

should be subject to arbitral review. The Board contends that such an interpretation rewrites the CNA, contravening the principle that there must be clear and unmistakable language in the contract that non-renewals would be subject to arbitrator review before a waiver of the Board's rights under *N.J.S.A.* 18A:27–4.1b can be found. Stated differently, the CNA's language must be more specific to override *N.J.S.A.* 18A:27–4.1b.

In a matter closely resembling the instant appeal, the Appellate Division considered whether a fixed-term employee's allegedly disciplinary non-renewal was subject to arbitration because the pertinent collective negotiations agreement made "discipline" subject to arbitration. *See Marlboro Twp. Bd. of Educ. v. Marlboro Twp. Educ. Ass'n,* 299 *N.J.Super.* 283, 286–87, 690 *A.2d* 1092 (holding that non-renewal of bus driver who had excessive absences over long period was not subject to grievance procedure), *certif. denied,* 151 *N.J.* 71, 697 *A.2d* 544 (1997). The court held that it would not "rewrite" the contract to provide for arbitration in the context of the Board's right to non-renew its fixed-term employee when clear language to that effect was not present in the collective negotiation agreement. Judge Landau stated for the panel:

> The Board here did not purport to discipline Goldberg, nor is there any reason so to characterize its decision not to rehire her. It merely exercised a clearly enunciated contractual right not to renew, an issue we do not regard as arbitrable in these circumstances. We decline to insert judicially a tenure provision into a contract when it was not negotiated by the parties. *See Standard Refinery Union v. Esso Standard Oil Co.,* 31 *N.J.Super.* 548, 552, 107 *A.2d* 513 (App.Div.1954) ("[C]ourt will not write a new contract for the parties or vary, enlarge, alter or distort its terms for the benefit of one to the detriment of the other under the guise of judicial interpretation."). However, even if we deemed this to be a disciplinary termination, the rights of a similarly situated disciplinee should rise no higher than those of a faultless employee who had no right to reemployment.
> [*Id.* at 286–87, 690 *A.2d* 1092.]

In another case, the Supreme Court of New Hampshire similarly held that grievance language employed in the collective agreement between a school board and union (specifically, a reference to "discipline" and "discharge" of employees) was not specific enough to override a New Hampshire statute giving the school

board authority not to renominate probationary teachers. *Appeal of Westmoreland Sch. Bd.*, 132 *N.H.* 103, 564 *A.*2d 419, 422–23 (1989). The court reasoned as follows:

> The heart of the dispute between the parties is whether the school board is required to process a grievance concerning the nonrenewal of a probationary teacher's contract, which the WTA alleges constitutes a discharge under Article 16 requiring just cause.
>
> 
>
> &#42; &#42; &#42;
>
> The overarching issue in the present case is whether the parties actually have negotiated to arbitrate, . . . not whether they have the authority to do so . . . . The board contends that the term discipline, as used in CBA Article 16, refers only to those situations where a teacher has violated one of its rules or regulations and that, because the board never contended that Hanson had violated a rule or regulation, she was not entitled to the procedural protection of discharge only for just cause. The board contends, rather, that Hanson's nonrenewal was outside the scope of the CBA and covered only by *RSA* 189:14–a (Supp.1988). That statute requires school districts to provide written notice on or before March 31 to teachers who have taught in that district for one or more years that they will not be renominated or reelected. *Id.*,:14–a, I(a) (Supp.1988). . . .
>
> In contrast, the WTA focuses not on the word discipline, but on the word discharge. It contends that Article 16 governs discharges, and that the term discharge is broad enough to include nonrenewals. The WTA reasons that because Black's Law Dictionary (5th ed.1979) defines discharge as termination, *id.* at 416, and this court has treated a nonrenewal as a termination, *see Appeal of Watson*, 122 *N.H.* [664] at 667, 448 *A.*2d [417] at 419 [1982], the term discharge encompasses the nonrenewals involved here. Article 16 therefore requires the board to have just cause before deciding not to renominate Hanson. The WTA further reasons that since all disciplinary complaints are subject to the grievance procedure, a discharge (*i.e.*, non-renomination) is as well. Based on these arguments, the WTA asserts that it has raised a question of contract interpretation which, under Article 9, is sufficient to send the matter through the grievance procedure. . . .
>
> We disagree with the WTA's reading of the CBA and hold that it is not susceptible of a reading which covers this dispute. The term discharge in Article 9 is clearly used in connection with disciplinary action taken for violation of the board's regulations. The CBA provision states that "[a]n employee shall not be *disciplined* except for just cause." (Emphasis added.) Although we agree with the WTA that as a general proposition, the term discharge may be broad enough to encompass non-renominations, in the context of this CBA the article does not use the word discharge in such a broad manner. Rather, the article refers to discharge only in the context of a violation of board rules. Viewed in this light, we can state with positive assurance that the CBA is not susceptible of a reading which would cover the asserted dispute. . . .

> The real issue here ... is whether the contracting parties have agreed to arbitrate a particular dispute. As we have stated before, "the extent of an arbitrator's jurisdiction depends upon the extent of the parties' agreement to arbitrate." *School Dist. # 42 v. Murray*, 128 *N.H.* [417] at 420, 514 *A.2d* [1269] at 1272 [1986]. [T]he WTA takes the contractual language of the CBA provision it relies on too far out of context for us to conclude that the parties intended to arbitrate this dispute.

[*Id.* at 421–23 (some citations omitted).]

 Just as those courts determined in the above cases,[7] it appears to us from a fair review of the language of the CNA that non-renewals, disciplinary or not, were not implicitly made subject to arbitral review. The CNA's language does not convey a clear waiver of the Board's rights in respect of non-renewals conferred by *N.J.S.A.* 18A:27–4.1b. A waiver would have been accomplished had the agreement included specific language to that effect, such as that included in a public-sector negotiated agreement reviewed by the Supreme Judicial Court of Massachusetts that stated: "No teacher will be disciplined, reprimanded, reduced in compensation, suspended, demoted, dismissed or *non-renewed* without just cause." *Sch. Comm. of Natick v. Educ. Ass'n of Natick*, 423 *Mass.* 34, 666 *N.E.2d* 486, 487 (1996) (emphasis added). Having not included such language, despite all parties' (the Board and Union) awareness of *N.J.S.A.* 18A:27–4.1b, we will not deem the instant matter to be arbitrable under the terms of this CNA. *See also Morris v. Bd. of Educ. of Laurel Sch. Dist.*, 401 *F.Supp.* 188, 205–06 (D.Del.1975) (holding that contract reference to "discipline" is insufficient to convey intent by school board to delegate to

---

[7] The dissent points to *City of Nashua School District # 42*, 132 *N.H.* 699, 571 *A.2d* 902 (1990), however, that decision did not overturn *Westmoreland's* analysis in respect of the contractual term "discipline" and whether it could render arbitrable a decision not to renominate a non-tenured employee. Rather, *Nashua* allowed arbitration to go forward on an alleged violation of the contract provision governing sick leave. *Id.* at 704–05, 571 *A.2d* 902. That said, the dissent of Justice Thayer, joined by then New Hampshire Supreme Court Justice Souter, raised a strong argument challenging the court's reasoning permitting arbitration in respect of that specific contract language. *Id.* at 706–08, 571 *A.2d* 902 (Thayer, J., dissenting).

arbitrators its legislatively authorized discretion concerning contract renewal).

To arrive at defendants' interpretation of the CNA, either words must be added to it (*i.e.*, "non-renewed" in Article IV), or the contractual language (here, "discipline") must be taken "too far out of context [for us] to conclude the parties intended to arbitrate this dispute." *Westmoreland, supra,* 564 A.2d at 423. The same goes for the term "layoff," which connotes involuntary dismissal during the term of a contract, and is not applicable to the non-renewal of a particular employee's appointment at the end of a fixed term. Contractual language such as that used in *Natick, supra,* 666 N.E.2d at 487, was available to the parties; yet, their negotiated agreement does not include the necessary specificity to subject non-renewal of fixed-term employees to arbitral review. Given the statutory backdrop against which the parties' negotiation occurred, we hold that more was necessary to effectuate clearly and unmistakably a waiver of the Board's authority under *N.J.S.A.* 18A:27–4.1b.[8] In this public-sector employment dispute,

---

[8] We note that many of the decisions cited by the dissent do not involve, as here, the interplay of a collective negotiation agreement with a statute that speaks directly to the disputed action. *State v. Public Safety Employees Ass'n,* 798 P.2d 1281 (Alaska 1990); *United Transp. Union v. S. Cal. Rapid Transit Dist.,* 7 Cal.App.4th 804, 9 Cal.Rptr.2d 702 (1992); *Bd. of Educ. of Town of Greenwich v. Frey,* 174 Conn. 578, 392 A.2d 466 (1978); *Bd. of Trs. of Cmty. Coll. Dist. No. 508 v. Cook County College Teachers Union,* 74 Ill.2d 412, 24 Ill.Dec. 843, 386 N.E.2d 47 (1979); *Cedar Rapids Ass'n of Fire Fighters v. City of Cedar Rapids,* 574 N.W.2d 313 (Iowa 1998); *Lewiston Firefighters Ass'n v. City of Lewiston,* 354 A.2d 154 (Me.1976); *Toledo Police Patrolman's Ass'n v. Toledo,* 127 Ohio App.3d 450, 713 N.E.2d 78, *appeal not allowed,* 83 Ohio St.3d 1474, 701 N.E.2d 381 (1998); *Voss v. City of Oklahoma City,* 618 P.2d 925 (Okla.1980); *State System of Higher Educ. v. State College Univ. Prof'l Ass'n,* 560 Pa. 135, 743 A.2d 405 (1999); *School Comm. of the City of Pawtucket v. Pawtucket Teachers Alliance AFT Local 930,* 120 R.I. 810, 390 A.2d 386 (1978). Further, at least one of those decisions, *Joint Sch. Dist. No. 10 v. Jefferson Educ. Ass'n,* 78 Wis.2d 94, 253 N.W.2d 536, 545 (1977), supports our holding, in that the grievance provision of the collective bargaining agreement included the terms "discharge and non-renewal," and, thus, specifically applied to a dispute over the non-renewal of certain probationary teachers.

a court should not deliver by fiat what was not obtained through negotiation.

## B.

In addition, we note the counterintuitive result that is reached were we to presume that this CNA meant to allow a non-renewed, fixed-term employee access to arbitral review based on a theory that the Board's determination not to renew the contract was a pretext for discipline. That access would bestow on the non-renewed, poorly performing employee, who claimed he or she was the subject of the supposed "disciplinary" action, greater rights than those given a competently performing individual whose contract simply was not renewed. The poorly performing employee would have the benefit of a hearing on the "cause" for termination. A non-deficient employee, who could not allege a "disciplinary" motivation on the employer's part, would not. As was observed in a setting similar to the matter at hand, "a disciplinee should be accorded no greater rights than those accorded to a faultless non-renewed employee." *Cresskill Bd. of Educ. v. Cresskill Educ. Ass'n,* 362 *N.J.Super.* 7, 15, 826 *A.*2d 778 (App.Div.2003)(citing *Marlboro, supra,* 299 *N.J.Super.* at 286–87, 690 *A.*2d 1092).

In *Cresskill, supra,* although the individual involved was able to grieve disciplinary acts taken against him during the term of his appointment, 362 *N.J.Super.* at 14–15, 826 *A.*2d 778, the board's later decision not to renew was not subject to arbitral review, notwithstanding that "the reasons cited by the superintendent for non-renewal ... were identical to the problems noted in previous performance evaluations and [were] the basis for [the employee's] termination during the term." *Id.* at 15, 826 *A.*2d 778. Similarly, defendants cite to the warning letter as proof that the non-renewal determinations actually constituted acts of discipline. That argument was rejected in *Cresskill,* and we likewise reject it. Notwithstanding that reasons pertaining to discipline or poor employment performance allegedly motivated the non-renewal recommendation, the act of non-renewal remains a prerogative of the

Board pursuant to *N.J.S.A.* 18A:27–4.1. Thus, although plaintiffs reasonably might contend that issuance of the warning letters was subject to being grieved, *see Cresskill, supra,* 362 *N.J.Super.* at 15, 826 *A.*2d 778, the act of non-renewal itself is before us, and the governing CNA language does not make non-renewal subject to arbitration. When analyzing the reach of the CNA's language, we look only to the face of the contract. *Bd. of Educ. of Twp. of Bloomfield v. Bloomfield Educ. Ass'n,* 251 *N.J.Super.* 379, 384, 598 *A.*2d 518 (App.Div.1990), *aff'd o.b.* 126 *N.J.* 300, 598 *A.*2d 517 (1991). *See also Cresskill, supra,* 362 *N.J.Super.* at 15, 826 *A.*2d 778 (examining legal question of contract arbitrability exclusively on contractual language; arbitration denied because non-renewal not included in grievance provision).

In that respect, we observe the slippery slope approached by the lower courts' tacit approval of using supervisory letters alluding to "discipline" as the reason for requiring arbitration of a subsequent non-renewal of a fixed-term contract. We discern no benefit to parties to a fixed-term public employment contract expending time and resources strategizing how to, on the one hand, transform such letters into a justification for a subsequent arbitration about "discipline," and, on the other hand, avoid the use of words in communications by supervisors that could be turned into a justification for a later arbitration of a nonrenewal based on an assertion that it concerned "discipline." By requiring a clear relinquishment in a collective negotiation agreement of a board of education's right not to renew an employee for any non-arbitrary or non-capricious reason, we avoid that type of maneuvering.

In sum, the Board is entitled to depend on the authority the Legislature conferred on it, subject to constitutional limitations, unless its statutory right can be and, explicitly, has been negotiated away. Arbitration is a voluntary device. Requiring that non-renewal be clearly and unmistakably subjected to arbitration under the terms of a collective negotiation agreement properly respects the Board's statutory prerogative over decisions concern-

ing the non-renewal of fixed-term contracts of employment. *See Red Bank, supra,* 78 *N.J.* at 140, 393 *A.*2d 267. *Cf. Wright v. Universal Maritime Service Corp.,* 525 *U.S.* 70, 80, 119 *S.Ct.* 391, 396, 142 *L.Ed.*2d 361, 371 (1998) (holding that waiver of statutorily conferred right in collective bargaining agreement must be "clear and unmistakable").

## IV.

In the absence of a clear inclusion of acts of non-renewal in the grievance procedure's reach, the dissent contends that another principle requires that we assume in our analysis an intention to make non-renewal subject to arbitral review. The dissent argues that an overriding presumption in favor of arbitrability, stemming from the *"Steelworkers* Trilogy,"[9] must provide a gloss to our implementation of the language agreed to by the parties. Indeed, the dissent begins with that presumption. *See post* at 209, 854 *A.*2d at 356 (stating that "[m]ore recently, this Court unanimously adopted and applied the principles articulated in the *"Steelworkers* Trilogy" to arbitration in the public sector." *Bd. of Educ. of the Twp. of Bloomfield v. Bloomfield Educ. Ass'n,* 126 *N.J.* 300, 598 *A.*2d 517 (1991), *aff'g o.b.,* 251 *N.J.Super.* 379, 598 *A.*2d 518 (App.Div.1990)"). However, our Court never "adopted" in full the *"Steelworkers* Trilogy;" specifically we have not endorsed a presumption in favor of arbitrability for the public sector. Conversely, we expressly have approved such a presumption for private-sector bargaining. *See, e.g., Standard Motor Freight, Inc. v. Local Union No. 560, Int'l Brotherhood of Teamsters,* 49 *N.J.* 83, 96, 228 *A.*2d 329 (1967).

---

[9] *United Steelworkers of Am. v. American Mfg. Co.,* 363 *U.S.* 564, 80 *S.Ct.* 1343, 4 *L.Ed.*2d 1403 (1960); *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.,* 363 *U.S.* 574, 80 *S.Ct.* 1347, 4 *L.Ed.*2d 1409 (1960); *United Steelworkers of Am. v. Enterprise Wheel & Car Corp.,* 363 *U.S.* 593, 80 *S.Ct.* 1358, 4 *L.Ed.*2d 1424 (1960). Those same principles later were reaffirmed in *AT & T Technologies v. Communications Workers,* 475 *U.S.* 643, 106 *S.Ct.* 1415, 89 *L.Ed.*2d 648 (1986).

Each of the decisions of the *"Steelworkers* Trilogy," as well as *AT & T,* the more recent U.S. Supreme Court decision that reaffirmed the principles therein set forth, were all private-sector employment disputes. In that setting, the *"Steelworkers* Trilogy" enunciated four principles: (1) "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit," *AT & T, supra,* 475 *U.S.* at 648, 106 *S.Ct.* at 1418, 89 *L.Ed.*2d at 655; (2) the question of substantive arbitrability is "undeniably an issue for judicial determination ... unless the parties clearly and unmistakably provide otherwise," *id.* at 649, 106 *S.Ct.* at 1418, 89 *L.Ed.*2d at 656; (3) "in deciding whether the parties have agreed to submit a particular grievance to arbitration, a court is not to rule on the potential merits of the underlying claims [including] determining whether there is particular language in the written instrument which will support the claim," *id.* at 649–50, 106 *S.Ct.* at 1419, 89 *L.Ed.*2d at 656; and (4) "where the contract contains an arbitration clause, there is a presumption of arbitrability in the sense that '[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.... Such a *presumption* is particularly applicable where the clause is ... broad.'" *Id.* at 650, 106 *S.Ct.* at 1419, 89 *L.Ed.*2d at 656–57 (citation and internal quotation marks omitted) (emphasis added).

In *Bloomfield, supra,* which this Court affirmed without discussion in a per curiam opinion, the Appellate Division delineated how the *"Steelworkers* Trilogy" principles should apply in a public-sector setting:

[1] The duty to arbitrate springs from contract, and the parties can only be compelled to arbitrate those matters which are within the scope of the arbitration clause of their contract. *Moreira Constr. Co., Inc. v. Wayne Tp.,* 98 *N.J.Super.* 570 [238 *A.*2d 185] (App.Div.1968), *certif. denied.* 51 *N.J.* 467, 242 *A.*2d 15 (1968); *Wm. J. Burns, etc., Inc. v. N.J. Guards Union, Inc.,* 64 *N.J.Super.* 301 [165 *A.*2d 844] (App.Div.1960), *certif. denied.* 34 *N.J.* 464 [169 *A.*2d 742] (1961); *Harsen v. West Milford Tp. Bd. of Ed.,* 132 *N.J.Super.* 365 [333 *A.*2d 580] (Law Div.1975).[2]

When there is a dispute as to whether a grievance falls within the terms of the arbitration clause of the contract, it is the duty of the courts to determine whether the matter is arbitrable. *Moreira Constr. Co., Inc. v. Wayne Tp., supra; Wm. J. Burns, etc., Inc. v. N.J. Guards Union, Inc., supra.* [3] However, in determining whether a matter is arbitrable, the court is limited to ascertaining whether the party seeking arbitration is making a claim which, on its face, is covered by the contract and within the arbitration clause. The court may not, in any way, pass upon the merits of the actual dispute. *Jersey Central Power & Light Co. v. Local Union No. 1289, etc.,* 38 *N.J.* 95, 104 [183 *A.2d* 41] (1962); *United Steelworkers of America v. American Mfg. Co.,* 363 *U.S.* 564, 568, 80 *S.Ct.* 1343 [1347], 4 *L.Ed.2d* 1403 (1960).[4] If the arbitrator is found to have jurisdiction over a matter, the court must send it to arbitration, even though the court may think the dispute is patently frivolous. *United Steelworkers of America v. Warrior & Gulf Navigation Co.,* 363 *U.S.* 574, 583, 80 *S.Ct.* 1347 [1353], 4 *L.Ed.2d* 1409 (1960).

[*Bloomfield, supra,* 251 *N.J.Super.* at 384, 598 *A.2d* 518 (quoting *Clifton Bd. of Educ. v. Clifton Teachers Ass'n,* 154 *N.J.Super.* 500, 503–04, 381 *A.2d* 1226 (App.Div.1977)).]

■ The first three principles of *Bloomfield* functionally mirror the first three principles of the *"Steelworkers* Trilogy." Notably absent from *Bloomfield's* articulation of the fourth principle of the *"Steelworkers* Trilogy" is the "presumption" of arbitrability, *i.e.,* that "[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive reassurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." *Warrior & Gulf, supra,* 363 *U.S.* at 583, 80 *S.Ct.* at 1353, 4 *L.Ed.2d* at 1418. *Bloomfield* contains no such language. In fact, the word presumption, or any permutation thereof, does not appear in the *Bloomfield* decision, or in the *Clifton* decision from which the quoted passage in *Bloomfield* derives. The omission is telling. As the dissent suggests, the presumption of arbitrability taken from the *"Steelworkers* Trilogy" is perhaps the most important of the four principles. The *Bloomfield* court's failure to adopt the presumption significantly reflects a decision not to harmonize fully New Jersey public-sector arbitration jurisprudence with federal private-sector arbitration jurisprudence.[10]

---

10 Although not necessary to our disposition, we mention only that several courts in jurisdictions that do apply the presumption in favor of arbitration from

Our approach in *Bloomfield*, in that respect, coincides with that taken in other jurisdictions. Notable is the decision of the New York Court of Appeals in *Board of Education of Watertown City School District v. Watertown Education Association*, 93 *N.Y.2d* 132, 688 *N.Y.S.2d* 463, 710 *N.E.2d* 1064 (1999). In *Watertown*, the court dislodged a previous presumption *against* arbitration in the public sector that had been employed previously. *Id.* 688 *N.Y.S.2d* 463, 710 *N.E.2d* at 1069–70. Yet, in so doing, the court did *not* adopt simultaneously a presumption *in favor* of arbitrability. *Id.* 688 *N.Y.S.2d* 463, 710 *N.E.2d* at 1070. Rather, the court preserved its own *Liverpool*-approach, which asks a court to answer only two questions: Can the matter be negotiated?; If so, did the parties negotiate it? *Id.* 688 *N.Y.S.2d* 463, 710 *N.E.2d* at 1068–69 (citing *Matter of Acting Superintendent of Schs. of Liverpool Faculty Ass'n v. United Liverpool Facullty Ass'n*, 42 *N.Y.2d* 509, 399 *N.Y.S.2d* 189, 369 *N.E.2d* 746 (1977)). Although the court found that application of the *Liverpool*-approach often resulted in a finding of arbitrability, it nonetheless "preserve[d] the two-step ... analysis for judicial threshold consideration, *free of any presumptions.*" *Watertown, supra,* 688 *N.Y.S.2d* 463, 710 *N.E.2d* at 1070 (emphasis added).

Thus, the *Watertown* holding accords with *Bloomfield*, wherein we did not endorse a presumption in favor of contractual arbitra-

the "*Steelworkers* Trilogy" have not applied the presumption to narrow arbitration clauses such as the one before us. *See, e.g., Trap Rock Indus. v. Local 825, Int'l Union of Operating Eng'rs, AFL–CIO*, 982 *F.2d* 884, 888 n. 5 (3d Cir.1992) (observing that presumption in federal law favoring arbitration of private-sector labor disputes not applicable where matter involves narrow arbitration clause); *Salary Pol'y Employee Panel v. Tennessee Valley Auth.*, 868 *F.2d* 872, 877–79 (6th Cir.1989) (*TVA* ) (same); *Teamsters Local 315 v. Union Oil Co.*, 856 *F.2d* 1307, 1311–15 & n. 6 (9th Cir.1988)(same); *see generally Local No. 1710, Int'l Ass'n of Fire Fighters v. City of Chicopee*, 430 *Mass.* 417, 721 *N.E.2d* 378, 388 (1999) (distinguishing "*Steelworkers* Trilogy" and *AT & T* (as well as dozens of other cases) that involved broad arbitration clauses, declining to apply presumption favoring arbitration to public-sector collective bargaining agreement containing narrow arbitration provision, and restraining arbitration). At least one federal court has questioned whether a presumption in favor of arbitrability should ever apply in the public sector. *TVA, supra,* 868 *F.2d* at 877.

bility for the public sector. Rather, we maintained a two-step analysis that requires determination first, whether a matter can be negotiated, and second, whether the parties, in fact, negotiated it. In respect of the latter, we assess the language contained in the arbitration provision negotiated by the parties, mindful of the relative positions of the public-sector parties when they come to the negotiating table.

In this area of the law, cases are factually varied; thus, distinguishing features must be taken into consideration when assessing the value of out-of-state cases. For example, the dissent discusses at length *Kaleva–Norman–Dickson School District No. 6 v. Kaleva–Norman–Dickson School Teachers' Association,* 393 *Mich.* 583, 227 *N.W.*2d 500, 501 (1975), *post* at 221, 854 *A.*2d at 364, which dealt with a probationary teacher who was informed in writing by the local board of education that her contract would not be renewed for the following year. That decision involved an arbitration provision much more broadly worded than the one in this case. The provision stated: "No teacher shall be disciplined, reprimanded, reduced in rank or compensation, or deprived of any professional advantage without just cause." *Id.* at 503. The sweeping reference to being "deprived of any professional advantage without just cause," arguably could include "non-renewals." The decision in *Kaleva* also relied heavily on a presumption in favor of arbitrability. *Id.* at 504–06. However, as discussed, we have not adopted such a presumption in the public sector, and certainly have not applied such a presumption in the context of a narrow arbitration provision in a *public-sector collective negotiations* agreement. *See also supra,* note 10. Therefore, *Kaleva* is not easily transposed into our State's public-sector-arbitration jurisprudence; we do not find it persuasive.

Thus, applying the second step in our approach to public-sector contract arbitrability questions in this matter requires a court to assess the CNA's language to determine whether it reasonably can be interpreted to have required non-renewals to be subject to arbitrator review for good cause. We hold that the CNA's

inclusion of the word "discipline" in its grievance procedure does not support such an interpretation. We decline to attribute to "discipline" an overly broad meaning that is not sensible in light of the relevant statutory provisions governing these parties. *See N.J.S.A.* 18A:17–3; *N.J.S.A.* 18A:27–4.1. The inclusion of the term "discipline" does not require arbitration of non-renewals of fixed-term employees.

## V.

In conclusion, the Board has the statutory right to renew, or not, a fixed-term employee for non-arbitrary and non-capricious reasons without being subject to review of that decision by an arbitrator. The CNA is silent about whether the parties intended the Board to give up that statutory right. In such circumstances, we hold that the CNA did not effectuate a waiver of the Board's non-renewal right. Accordingly, the judgment of the Appellate Division is reversed, and the arbitrations are restrained. The arbitration award previously entered in favor of defendant, Derek Copeland, is vacated.

Justice ZAZZALI, dissenting.

Over forty years ago, this Court, in a unanimous opinion by Chief Justice Weintraub, adopted the principles of arbitrability established by the United States Supreme Court in the "*Steelworkers* Trilogy." [1] *Jersey Cent. Power & Light Co. v. Local Union No. 1289 of the Int'l Bhd. of Elec. Workers*, 38 *N.J.* 95, 104–06, 183 *A.*2d 41 (1962). In that decision, the Court embraced the view that arbitration is "an integral part of our economic life and welcomed as a practical and expeditious means of disposition of

---

[1] *United Steelworkers of Am. v. Am. Mfg. Co.*, 363 *U.S.* 564, 80 *S.Ct.* 1343, 4 *L.Ed.*2d 1403 (1960); *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 *U.S.* 574, 80 *S.Ct.* 1347, 4 *L.Ed.*2d 1409 (1960); *United Steelworkers of Am. v. Enter. Wheel & Car Corp.*, 363 *U.S.* 593, 80 *S.Ct.* 1358, 4 *L.Ed.*2d 1424 (1960). These same principles were later reaffirmed in *AT & T Technologies v. Communications Workers of America*, 475 *U.S.* 643, 106 *S.Ct.* 1415, 89 *L.Ed.*2d 648 (1986).

industrial disputes." *Id.* at 103–04, 183 *A.*2d 41 (internal quotation marks and citation omitted). More recently, this Court unanimously adopted and applied the principles articulated in the "*Steelworkers* Trilogy" to arbitration in the public sector. *Bd. of Educ. of the Twp. of Bloomfield v. Bloomfield Educ. Ass'n,* 126 *N.J.* 300, 598 *A.*2d 517 (1991), *aff'g o.b.,* 251 *N.J.Super.* 379, 598 *A.*2d 518 (App.Div.1990). Today's decision represents a departure from those well-settled principles, and more troublingly, amounts to a departure that steps backwards in the otherwise commendable progress this Court has made in establishing fairness in our labor-law jurisprudence.

If this appeal presented a simple case of statutory construction or contract interpretation, the majority's approach to the present dispute might pass muster. But the theory that the majority applies to deny the arbitrability of this dispute runs up against almost a half-century of deeply ingrained principles that have been established by courts, legislatures, and agencies on both the federal and state levels. The majority also spurns the collective negotiations agreement, case law, and public policy that support the arbitration of this matter. What is more, it does so in the face of the enlightened jurisprudence of our sister states.

Apart from the majority's rejection of the past and the implications of its holding for the future, today the Court denies to fifteen Camden custodial and maintenance workers, who have labored for many years for their employer, their right to have a neutral third-party decide whether they have a job, knowing full well that at least one arbitrator has determined that the Board's actions were, in fact, disciplinary and might have been undertaken in "bad faith."

For those reasons, I must respectfully dissent.

## I.

As a context for my discussion, I offer the following summary of the facts.

At the end of the 1999–2000 school term, the Camden Board of Education voted not to renew the annual contracts of fifteen custodial and maintenance employees for the following school year. One month prior to that decision, a Board representative sent each of those employees a letter stating, in relevant part, "Due to your excessive absenteeism, disciplinary action maybe [sic] taken which may include but not be limited to not being recommended for reappointment for the 2000–2001 school year." At the time of their non-renewal, ten of the employees had worked for the Board for a decade or more; four of those employees had fifteen or more years of service.

After an informal appearance before the Board by several of the employees proved fruitless, the employees' union, Local 1079 Custodial and Maintenance Employees of the Communications Workers of America, AFL–CIO (Union), invoked the grievance procedures of the collective negotiation agreement between the Board and the Union. Article IV of that agreement provides that "[n]o employee shall be disciplined or reprimanded without just cause" and that disciplinary actions shall be subject to the grievance procedure outlined in the agreement. Article XII provides that "[l]ayoffs shall be by inverse seniority...." The Union argued that the Board's non-renewal decisions violated one or both of these provisions.

The Board and the Union agreed to waive the preliminary steps of the contractual grievance procedure outlined in Article III of the agreement and to proceed directly to arbitration. After several delays, an arbitrator commenced hearings on the first dispute, involving employee Derek Copeland. The arbitrator declined the Board's request to bifurcate and decide, prior to a hearing on the merits, the arbitrability of Copeland's claim. Instead, the arbitrator determined that although the procedural issue would be addressed as a threshold question, the parties would have to present their cases concerning the merits. Dissatisfied with that approach, the Board filed an action in the Law Division to restrain all of the arbitration hearings.

The Law Division refused to enjoin arbitration. In reaching its decision, the court concluded that the absence of explicit language in the agreement granting the employees tenure rights did not preclude them from arbitrating whether they were entitled to just-cause protection under the collective agreement, including protection from non-renewal. It noted that, under the controlling case law, it was for an "arbitrator to make a determination as to whether or not the scope of the rights afforded to the employees under the just cause provision, as well as whether the reason for the nonrenewals is pretextual in terms of either being discipline[ ] or a [r]use to engage in a layoff." Because the non-renewal was substantively arbitrable under the agreement, the court dismissed the Board's application for an injunction to restrain arbitration.

While that decision was on appeal, arbitration proceedings resumed. After considering both the procedural and substantive issues raised by the parties, the arbitrator entered an award in favor of Copeland. He determined that the Board violated the just-cause provision of the agreement and that the non-renewal breached the parties' agreement to arbitrate discipline. In his detailed, thirty-three-page opinion, the arbitrator concluded that the Board

> viewed the non-renewal as an ultimate disciplinary penalty .... Their intent could not have been clearer. This is not a simple case of the non-renewal of a contract employee .... This is a case where supervisory personnel embarked on a disciplinary course, in response to perceived misconduct.... [U]nquestionably, it was [the Board's] intent to apply termination as a disciplinary penalty. The termination of [Copeland's] employment in the context of a "non-renewal" appears to be nothing more than a pretext for what was truly the imposition of a disciplinary penalty.

In addition to finding that the Board terminated without just cause, the arbitrator added that

> there are several bases to conclude that it acted arbitrarily. It was arbitrary to allege misconduct without proof; it was arbitrary to apply a further penalty after [Copeland] corrected his conduct; and it was arbitrary to act inconsistently with the Board's own policy. Finally, there is even a scent of bad faith in warning an employee that he will face certain severe disciplinary penalties if misconduct is repeated and then applying the most severe of the threatened penalties despite no further misconduct on the part of the employee.

Based on his finding that the Board violated the contractual just-cause provision with respect to Copeland's employment, the arbitrator ordered the Board to reinstate Copeland with full back pay, to be reduced by his interim earnings.

Meanwhile, the Board appealed the Law Division's decision and renewed its request to enjoin the arbitration proceedings. The Appellate Division refused to enjoin arbitration and affirmed the Law Division, concluding that even if an employee did not enjoy tenure by virtue of the express terms of a collective negotiations agreement, "[a]n untenured employee may also be entitled to arbitrate the termination of employment if the employer has negotiated a disciplinary review procedure which includes the right of an untenured employee to arbitrate termination for misconduct." *Camden Bd. of Educ. v. Alexander*, 352 *N.J.Super.* 442, 447, 800 *A.*2d 250 (2002).

This Court granted the parties' petition and cross-petition for certification. 175 *N.J.* 77, 812 *A.*2d 1109 (2002).

## II.

### *Negotiability of Disciplinary Non–Renewal of Non–Tenured, Non–Professional Public School Employees*

In the public sector, the initial decision concerning whether the parties may bargain for the alleged protections giving rise to an underlying dispute depends in part on whether the matter is within the "scope of collective negotiations." *Ridgefield Park Educ. Ass'n v. Ridgefield Park Bd. of Ed.*, 78 *N.J.* 144, 154, 393 *A.*2d 278 (1978). "A matter which is not legally negotiable in the first place cannot be arbitrable." *Id.* at 160, 393 *A.*2d 278. A subject is negotiable between public employers and employees when "(1) the item intimately and directly affects the work and welfare of public employees; (2) the subject has not been fully or partially preempted by statute or regulation; and (3) a negotiated agreement would not significantly interfere with the determination of governmental policy." *In re Local 195, IFPTE v. State*, 88 *N.J.* 393, 404, 443 *A.*2d 187 (1982).

In its supplemental brief to this Court, the Board concedes that a just-cause standard for non-renewal is negotiable for custodial and maintenance employees. Inexplicably, however, the Board also argues that education statutes preempt the present matter from proceeding to arbitration because any relief granted by the arbitrator would result in the reversal of its non-renewal decisions and the reinstatement of these employees. The Board argues that two statutes, *N.J.S.A.* 18A:16–1 and *N.J.S.A.* 18A:27–4.1, preclude any agent but the school board from renewing a non-professional employee and therefore preempt an arbitrator from reviewing the Board's non-renewal decision in this appeal. Thus, although the Board characterizes its arguments as raising questions about the arbitrability of the employees' grievances, the Board also raises scope-of-negotiations concerns by arguing preemption.

The majority opinion acknowledges that the matter before us does not present any meritorious scope-of-negotiations issues. *Ante* at 194, 854 *A.*2d at 347. I agree with its assessment. However, because the Board raises the issue of preemption, and because the majority's view of substantive arbitrability depends largely on the statutes identified by the Board, some discussion of the second prong of the scope-of-negotiations test is necessary to clarify whether the subject has been fully or partially preempted by statute or regulation.[2]

In addressing the question of preemption, we have recognized that "the mere existence of a statute or regulation relating to a given term or condition of employment does not automatically preclude negotiations." *Wright v. Bd. of Educ. of East Orange,* 99 *N.J.* 112, 119, 491 *A.*2d 644 (1985) (citing *In re Local 195, IFPTE, supra,* 88 *N J.* at 403, 443 *A.*2d 187; *State v. State Supervisory Employees Ass'n,* 78 *N.J.* 54, 81, 393 *A.*2d 233 (1978)). Where

---

[2] Although I briefly address the topic here, I agree with the majority that primary jurisdiction regarding scope-of-negotiations questions rests with the Public Employment Relations Commission (PERC). *Ante* at 194, 854 *A.*2d at 347.

"statutes or regulations concerning terms and conditions of public employment ... permit a public employer to exercise a certain measure of discretion, ... [a] contractual provision affording the employees rights or benefits in excess of that required by the statute or regulation is valid and enforceable." *State Supervisory Employees Ass'n, supra,* 78 *N.J.* at 81, 393 *A.*2d 233. As Justice Clifford has noted: "Thus, 'negotiation is preempted only if the statutory or regulatory provisions speak in the imperative and leave nothing to the discretion of the public employer.' " *Wright, supra,* 99 *N.J.* at 119, 491 *A.*2d 644 (quoting *In re Local 195, IFPTE, supra,* 88 *N.J.* at 403–04, 443 *A.*2d 187) (internal quotations and alterations omitted). Stated differently, a statute must "expressly, specifically and comprehensively" fix the pertinent term of employment to be preemptive. *Council of N.J. State Coll. Locals v. State Bd. of Higher Educ.,* 91 *N.J.* 18, 30, 449 *A.*2d 1244 (1982). Those standards demonstrate that neither of the statutes identified by the Board preempt arbitration in this instance.

The first statute cited by the Board, *N.J.S.A.* 18A:27–4.1, governs the "[a]ppointment, transfer, removal, or renewal of officers and employees." That statute is concerned with the "mechanics of a renewal/non-renewal decision." *Jackson Twp. Bd. of Educ. v. Jackson Educ. Ass'n,* 334 *N.J.Super.* 162, 171, 757 *A.*2d 311 (App.Div.), *certif. denied,* 165 *N.J.* 678, 762 *A.*2d 659 (2000). It specifies that a board may not renew a contract unless (1) the Chief School Administrator (CSA) has recommended renewal or (2) a non-renewed employee "can convince the board otherwise at the 'informal appearance' to which the employee is entitled after being notified of [a] non-renewal recommendation." *Id.* at 171–72, 757 *A.*2d 311. As such, the statute "does not expressly purport to address scope-of-negotiations questions at all. Rather, it only defines how a local board may act on its CSA's recommendation." *Id.* at 172, 757 *A.*2d 311. Accordingly, the statute does not preclude a board of education from providing employees with additional job protections, such as the right to arbitrate a disciplinary non-renewal, or from permitting an arbitrator to restore an employee who has been non-renewed in violation of a collective

agreement. *Cf. Local No. 153, Office & Prof'l Employees Int'l Union v. Trust Co. of N.J.*, 105 *N.J.* 442, 452, 522 *A.*2d 992 (1987) (explaining "a rigid rule that an arbitrator's remedy must be expressly authorized by the bargaining agreement would subvert the purposes of arbitration").

Neither does *N.J.S.A.* 18A:16–1 preempt negotiating disciplinary non-renewals or arbitration awards restoring employees who have been improperly disciplined. That statute vests the Board with discretion in making its hiring decisions: "Each board of education, subject to the provisions of this title and of any other law, shall employ and may dismiss ... such principals, teachers, janitors and other officers and employees, as it shall determine ...." *Ibid.* It does not, however, restrict the Board in the exercise of that discretion. Nor can it be said to set forth "expressly, specifically and comprehensively" the terms that may be included in the contracts of non-professional employees. *Council of N.J. State Coll. Locals, supra,* 91 *N.J.* at 30, 449 *A.*2d 1244. Like *N.J.S.A.* 18A:27–4.1, *N.J.S.A.* 18A:16–1 does not preclude the Board from affording employees greater job security, including the right to arbitrate a disciplinary non-renewal, or to allow arbitrators to fashion remedies that restore employees to their former positions when the Board improperly terminates an employee.

In short, just-cause protection for the disciplinary non-renewal of non-tenured, non-professional public school employees is not preempted by statute. Similarly, an arbitration award restoring an employee to his or her position held prior to the imposition of an inappropriate disciplinary penalty is not preempted by statute. Accordingly, there is no genuine scope-of-negotiations concern.

III.

*Arbitrability of Disciplinary Non–Renewal of Non–Tenured, Non–Professional Public School Employees*

As I have noted, the majority correctly concludes that this appeal does not present any meritorious scope-of-negotiations

issues. Despite its arguments about preemption, the Board also concedes that negotiability is not at issue. As the Board succinctly puts it, at "[t]he heart of this case is not whether [just-cause protection] could be negotiated and properly placed in an agreement, but[,] rather, whether that was actually done by the parties." That argument raises concerns about the dispute's "substantive arbitrability," that is, "whether the particular grievance is within the scope of the arbitration clause specifying what the parties have agreed to arbitrate." *Standard Motor Freight, Inc. v. Local Union 560, Int'l Bhd. of Teamsters*, 49 *N.J.* 83, 96, 228 *A.*2d 329 (1967); *see also AT & T Techs., supra*, 475 *U.S.* at 649, 106 *S.Ct.* at 1418, 89 *L.Ed.*2d at 656.

The question of a dispute's substantive arbitrability is for the courts to decide. *Standard Motor Freight, supra*, 49 *N.J.* at 96, 228 *A.*2d 329. As I will discuss shortly, the limited role a court should play while performing a substantive-arbitrability analysis, in both the public and private sectors, is well established in New Jersey. Similarly, out-of-state jurisprudence resoundingly requires that courts considering the substantive arbitrability of public-sector labor disputes favor arbitration and avoid becoming entangled in the merits of arbitration grievances.

Despite the universal applicability of those settled principles, the majority has chosen, without expressing any sound reason for so doing, to eschew almost a half-century of labor jurisprudence and to create a new doctrinal framework for determining the arbitrability of public-sector grievances. As detailed below, the majority's approach essentially inverts the present test of substantive arbitrability, creating a presumption against arbitration in the public sector absent a "clear[ ] and unmistakabl[e]" waiver of statutory authority. *Ante* at 200, 854 *A.*2d at 351. This result not only unnecessarily disrupts cardinal principles of labor arbitration, but also contravenes express public-policy determinations ad-

vanced by both the legislative and executive branches of our government.

## A.

As noted at the outset, the concept of substantive arbitrability has its roots in a series of United States Supreme Court cases known as the *"Steelworkers* Trilogy." Those cases establish that when a court addresses whether an arbitration provision encompasses the grievance at issue, its function is "very limited." *Standard Motor Freight, supra,* 49 *N.J.* at 96, 228 *A.*2d 329 (quoting *Am. Mfg. Co., supra,* 363 *U.S.* at 567–68, 80 *S.Ct.* at 1346, 4 *L.Ed.*2d at 1407). The court's inquiry is " 'confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract.' " *Ibid.* Thus, a dispute arising under a collective negotiations agreement must be sent to arbitration " 'unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.' " *Ibid.* (quoting *Warrior & Gulf Nav., supra,* 363 *U.S.* at 582–83, 80 *S.Ct.* at 1353, 4 *L.Ed.*2d at 1417–18). All doubts are "resolved in favor of coverage." *Ibid.* In making that determination, however, "[t]he court may not, in any way, pass upon the merits of the actual dispute." *Bd. of Educ. of the Twp. of Bloomfield v. Bloomfield Educ. Ass'n,* 251 *N.J.Super.* 379, 384, 598 *A.*2d 518 (App.Div.1990) (citation omitted), *aff'd o.b.,* 126 *N.J.* 300, 598 *A.*2d 517 (1991). Even if a court believes that the dispute is "patently frivolous," *ibid.,* it must be sent to arbitration if the terms of the agreement are susceptible to an interpretation that would encompass the underlying claim. Those rules apply with equal force in the private and public sectors. *Bloomfield, supra,* 126 *N.J.* 300, 598 *A.*2d 517.

With the controlling principles thus summarized, I turn to the contractual language found in Articles III, IV, and XII of the parties' agreement. Article III provides that a grievance shall include "a complaint by an employee or the Union that there has been ... a personal loss, injury or inconvenience because of a violation, misinterpretation or misapplication of this Agreement." That provision also provides for binding arbitration as the terminal step of the grievance process. Article IV requires that "[n]o

employee shall be disciplined or reprimanded without just cause" and that all disciplinary actions "shall be subject to the Grievance Procedure ... set forth [in the agreement]." Article XII mandates that all "[l]ayoffs shall be by inverse seniority, with the least senior employee to be laid off first." The employees raise two distinct arguments with respect to those provisions.

Focusing first on Article IV, the employees contend that the term "discipline" as used in the agreement includes disciplinary non-renewals and that the Board violated this provision in not renewing their contracts without just cause. The Board, however, argues that non-renewal is a decision reserved to it regardless of whether the non-renewal implicates discipline. Therefore, the Board maintains that the decision not to renew employment falls outside of the discipline and grievance provisions of the collective agreement. The employees, in turn, contend that the Board's approach amounts to a misinterpretation or misapplication of the agreement that requires resolution through arbitration.

In addition to challenging the non-renewal decisions on disciplinary grounds, the employees argue that the Board may have violated the seniority provision contained in Article XII of the agreement. They assert that the Board's non-renewal decisions were intended to bring about a reduction in force, *i.e.*, layoffs. As support for that claim, the employees maintain that during negotiations the Board indicated that bargaining unit employees would have to be "let go" due to overstaffing. The employees also point to the failure of the Board to fill any of the fifteen vacancies created as a result of its non-renewal decisions. Because the collective agreement mandates that all layoffs must be conducted by inverse seniority, the employees allege that the non-renewal decisions may have violated the agreement and must be submitted to arbitration. In response, the Board contends that the agreement's provisions apply only during the annual contract period, that at the end of each year the employees must "start from ground zero," and that the Board has the choice to non-renew any

employee—irrespective of seniority—at the end of the school year without violating the agreement.

Because the employees and the Board disagree over the interpretation of the term "discipline" and whether non-renewal can be a disciplinary act within the meaning of Article IV of the agreement, and because there is no express provision in the agreement excluding non-renewal decisions from the discipline or grievance provisions of the agreement, the employees make a claim that on its face must be submitted to the arbitrator. *Standard Motor Freight, supra,* 49 *N.J.* at 96, 228 *A.*2d 329. Stated differently, "[t]here being a bona fide dispute between the parties as to the interpretation of the contract, [the] grievance [is] cognizable." *Bd. of Educ. of the Woodstown–Pilesgrove Reg'l Sch. Dist. v. Woodstown–Pilesgrove Reg'l Educ. Ass'n,* 81 *N.J.* 582, 595, 410 *A.*2d 1131 (1980). Whether the discipline and grievance provisions of the agreement cover disciplinary non-renewals, whether the non-renewal decisions of the Board were intended to be a form of discipline, and whether the employees were disciplined without just cause are questions for the arbitrator because those questions require the interpretation and application of the contract and, thereby, go to the merits of the underlying dispute.

For similar reasons, arbitration must be permitted to proceed with respect to the alleged violation of Article XII. Although there is no dispute that the Board has the right to engage in layoffs when appropriate, it must do so in a manner consistent with the parties' agreement. Because the employees' complaint alleges a violation of Article XII, and because a violation of that provision would result in a "personal loss, injury or inconvenience" to the employees that is cognizable under the agreement's grievance provision, that dispute must be submitted to arbitration. It remains for the arbitrator to decide whether the Board's actions constituted a layoff and, if so, whether the Board's reduction in force complied with the seniority provisions of Article XII.

In sum, applying the principles of the *Steelworkers* Trilogy adopted by our case law, the Court's role in this matter is to

determine whether the parties agreed to submit disputes over alleged violations, misinterpretations, or misapplications of Articles IV and XII to arbitration. Because there is no express exclusion or other forceful evidence suggesting that non-renewal decisions are not covered by those articles or by the grievance provision of the agreement, the matter should be sent to arbitration. Under the *Steelworkers* Trilogy, determining this dispute's arbitrability does not allow, much less require, the Court to even consider which party is correct with respect to whether non-renewal decisions are encompassed within the just-cause provision of the agreement or if the Board's actions constituted a layoff. Those questions are for the arbitrator.

### B.

This Court has explicitly applied the principles of the *Steelworkers* Trilogy to public sector employees. *Bloomfield, supra,* 126 *N.J.* 300, 598 *A.*2d 517. In this, New Jersey is not unique. In fact, "[t]he applicability of [*Steelworkers* ] trilogy principles to the public sector has been recognized by nearly all state courts which have considered the question." *United Transp. Union v. S. Cal. Rapid Transit Dist.,* 7 *Cal.App.*4th 804, 814, 9 *Cal.Rptr.*2d 702 (1992) (internal quotation marks and citation omitted) (alterations in original); *see, e.g., State v. Public Safety Employees Ass'n,* 798 *P.*2d 1281 (Alaska 1990); *Bd. of Educ. of Town of Greenwich v. Frey,* 174 *Conn.* 578, 392 *A.*2d 466 (1978); *Bd. of Trs. of Cmty. Coll. Dist. No. 508 v. Cook County College Teachers Union,* 74 *Ill.*2d 412, 24 *Ill.Dec.* 843, 386 *N.E.*2d 47 (1979); *Cedar Rapids Ass'n of Fire Fighters v. City of Cedar Rapids,* 574 *N.W.*2d 313 (Iowa 1998); *Lewiston Firefighters Ass'n v. City of Lewiston,* 354 *A.*2d 154 (Me.1976); *Local Union No. 1710, Int'l Ass'n. of Fire Fighters, AFL–CIO v. City of Chicopee,* 430 *Mass.* 417, 721 *N.E.*2d 378 (1999); *Kaleva–Norman–Dickson Sch. Dist. No. 6 v. Kaleva–Norman–Dickson Sch. Teachers' Ass'n,* 393 *Mich.* 583, 227 *N.W.*2d 500 (1975); *Appeal of Westmoreland Sch. Bd.,* 132 *N.H.* 103, 564 *A.*2d 419 (1989); *Bd. of Educ. of Watertown City Sch.*

*Dist. v. Watertown Educ. Ass'n*, 93 *N.Y.*2d 132, 688 *N.Y.S.*2d 463, 710 *N.E.*2d 1064 (1999); *Toledo Police Patrolman's Ass'n Local 10 v. City of Toledo*, 127 *Ohio App.*3d 450, 713 *N.E.*2d 78, *appeal denied*, 83 *Ohio St.*3d 1474, 701 *N.E.*2d 381 (1998); *Voss v. City of Oklahoma City*, 618 *P.*2d 925 (Okl.1980); *State System of Higher Educ. v. State College Univ. Prof'l Ass'n*, 560 *Pa.* 135, 743 *A.*2d 405 (1999); *School Comm. of the City of Pawtucket v. Pawtucket Teachers Alliance AFT Local 930*, 120 *R.I.* 810, 390 *A.*2d 386 (1978); *Peninsula Sch. Dist. No. 401 v. Public Sch. Employees of Peninsula*, 130 *Wash.*2d 401, 924 *P.*2d 13 (1996); *Joint Sch. Dist. No. 10, City of Jefferson v. Jefferson Educ. Ass'n*, 78 *Wis.*2d 94, 253 *N.W.*2d 536 (1977).[3]

Several states that have considered the question of substantive arbitrability in circumstances remarkably similar to this appeal have determined that arbitration must be permitted to proceed. For example, in *Kaleva–Norman–Dickson School District No. 6 v. Kaleva–Norman–Dickson School Teachers' Ass'n, supra*, a probationary (non-tenured) teacher under contract with the local school board was notified in writing that her contract would not be renewed for the following school year. 227 *N.W.*2d at 501. At the time of her non-renewal, she was advised that her services were " 'not satisfactory.' " *Id.* at 503. The teacher filed a grievance, asserting that the non-renewal of her contract was a "violation, misinterpretation or misapplication" of the collective agreement between the board and the teachers' union. *Id.* at 502. Specifi-

---

[3] The majority observes that "many of the decisions cited by the dissent do not involve, as here, the interplay of a collective negotiation agreement with a statute that speaks directly to the disputed action." *Ante* at 200 n. 8, 854 *A.*2d at 351 n. 8. That attempted distinction does not detract from the fact that state courts have universally followed the *Steelworkers* Trilogy in the public sector. Moreover, as discussed in greater detail below, those courts that have confronted the "interplay" between a collective agreement and a statute have continued to apply the *Steelworkers'* principles despite the presence of an applicable statute. *See, e.g., Kaleva–Norman–Dickson School District No. 6 v. Kaleva–Norman–Dickson School Teachers' Ass'n, supra*, 393 *Mich.* 583, 227 *N.W.*2d 500; *Appeal of Westmoreland School Bd., supra*, 132 *N.H.* 103, 564 *A.*2d 419; *Peninsula School Dist., supra*, 130 *Wash.*2d 401, 924 *P.*2d 13.

cally, she alleged that the non-renewal of her contract violated a clause in the agreement that provided "[n]o teacher shall be disciplined, reprimanded, reduced in rank or compensation, or deprived of any professional advantage without just cause." *Id.* at 503. In response, the board argued that the non-renewal was non-arbitrable under the agreement because the board had "reserved to itself without limitation all powers, rights and authority conferred upon and vested in it by the laws of th[e] state, including the right to 'hire all employees' and to determine 'the conditions for their continued employment or their dismissal or demotion,'...." *Ibid.* The trial court agreed with the board and imposed an injunction restraining arbitration. *Id.* at 501. The appellate court affirmed. *Ibid.* On appeal, the Michigan Supreme Court reversed and permitted arbitration to proceed. *Ibid.*

At the outset of its analysis, the court acknowledged that there was no dispute that the teacher's proposed termination was in accord with the Teachers' Tenure Act, a state law that placed all teachers on probation during their first two years of employment and that permitted the discontinuation of their services during that period on sixty-days written notice. *Ibid.* Despite the existence of the board's statutory right to terminate a probationary teacher for any reason or no reason, the court nevertheless confronted the issue of whether, "under the collective bargaining agreement[,] the board limited its right under the Act to discontinue the employment of a probationary teacher." *Ibid.*

Turning to that question, the court explained that "[t]he policy favoring arbitration of disputes arising under collective bargaining agreements, as enunciated by the United States Supreme Court in the Steelworkers' Trilogy, is appropriate for contracts entered into under the [Public Employment Relations Act]." *Id.* at 503–04 (footnote omitted). Accordingly, it adopted "[t]he rule promulgated by the United States Supreme Court [that] puts the burden on the party who would exclude a matter from a general arbitration clause to do so expressly and explicitly." *Id.* at 506.

Applying that principle to the dispute before it, the court concluded that arbitration had to proceed because the board did not "specifically reserve from arbitration" claims arising under the collective agreement's discipline clause and because "[t]here [was] no evidence, forceful or otherwise, of a purpose to 'exclude' from arbitration claims based on [the discipline clause]." *Id.* at 505. In reaching that conclusion, the court rejected the board's argument that the teacher's "claim 'on its face' is not governed by the agreement but by the reserved rights of the board, including its rights under the Teachers' Tenure Act." *Id.* at 504. Such an interpretation, the court reasoned, would lead it to delve impermissibly into the merits of the underlying dispute. It explained:

> The agreement of the parties indeed includes a forceful reservation by the board of rights in certain matters. Arguably, in such a situation a court should have leeway to weigh the competing claims and determine whether the reservation of rights by the board, if not expressly, at least impliedly covers the disputed matter. That approach, however, gives to the court the task assigned to the arbitrator—namely, the interpretation and application of the contract.
>
> [*Id.* at 505.]

Instead, the court concluded that when "deciding whether a dispute involving an issue of contract interpretation is arbitrable, a court should guard against the temptation to make its own interpretation of the substantive provisions of the contract encompassing the merits of the dispute." *Id.* at 505–06. Adhering to that principle, the Michigan Supreme Court held that whether the teacher's or the board's interpretation of the agreement was correct was a question of contract interpretation left for the arbitrator. *Id.* at 506. Accordingly, it dissolved the injunction restraining arbitration because the teacher's claim "d[id] not pertain to a matter the parties specifically excluded from arbitration." *Ibid.*

Another case applying the same approach to substantive arbitrability, this time in the context of the non-renewal of a school bus driver, is *Peninsula School District No. 401 v. Public School Employees of Peninsula, supra.* In that decision, the Washington Supreme Court was asked to determine whether a school district

could agree in a collective bargaining agreement to a just-cause restriction for discipline or discharge when an education statute expressly limited employee contracts to one-year terms of employment. 924 *P.*2d at 14. The district had decided not to renew the driver's contract at the end of the year, citing unspecified performance problems. *Ibid.* The driver and the union argued that because just cause was required to discharge an employee, and no just cause had been given for her non-renewal, she was entitled to the grievance and arbitration provisions of a collective agreement. *Ibid.* In response, the district asserted that it was vested exclusively with the decision not to renew and that any restrictions on its non-renewal authority would conflict directly with the one-year limitation on employee contracts established by statute. *Ibid.*

The Washington Supreme Court determined that the dispute was both negotiable and arbitrable. *Id.* at 16–17, 19. With respect to negotiability, the court concluded that the one-year restriction imposed by the disputed statute "d[id] not limit the ability of a school district and a union to negotiate just cause limits on the district's authority to terminate employees during the term of a collective bargaining agreement," even when that agreement was for longer than one year. *Id.* at 17. Turning to the question of the dispute's substantive arbitrability, the court determined that the issue was "whether a discharge includes a nonrenewal of employment under the agreement." *Id.* at 19. Applying the principles set forth in the *Steelworkers* Trilogy, the court "look[ed] to the face of the collective bargaining agreement to determine whether [the] dispute [was] arbitrable." *Ibid.* Despite the fact that "the agreement contain[ed] no express reference to nonrenewal," and that it "also contain[ed] an exclusion stating that '[m]atters involving employee evaluation are specifically excepted and excluded from being arbitrable under this Article[,]' " the court concluded that the matter was arbitrable, holding that "an arbitrator should determine the applicability of [the] exclusion as well as the breadth of the word 'discharge' under the collective

bargaining agreement."[4] *Ibid.*

The New Hampshire Supreme Court has also considered and applied the teaching of the *Steelworkers* Trilogy in the face of existing education statutes. For example, in *Appeal of Westmoreland School Board, supra,* the court considered whether a probationary teacher could arbitrate her non-renewal under a provision in a collective bargaining agreement (CBA) providing just-cause protection against discipline, including discharge, "[w]henever an employee violates any of the Board's *regulations* [.]" 564 A.2d at 421 (emphasis added). The teacher, who was non-renewed after two years of service because the board felt "she was not a 'good match' for the job," argued she was entitled to arbitrate the board's decision under the CBA. *Id.* at 419. The school board contended that the non-renewal decision fell outside of the CBA and was covered exclusively by *N.H.Rev.Stat. Ann.* § 189:14–a, which only required written notice of the non-renewal decision for a teacher with less than three years of service in the school district. *Id.* at 422.

To resolve the dispute, the court began by considering the appropriate standard to employ when determining the arbitrability of a grievance. After careful consideration of the policy concerns animating the *Steelworkers* Trilogy and *AT & T Technologies,* the court concluded that it would adhere to the "positive assurance" standard; that is, it would apply a presumption of arbitrability unless it could "determine with positive assurance that the CBA is not susceptible of an interpretation that covers

---

[4] I am perplexed by the majority's assertion that this decision "does not provide persuasive support for the precise issue before us." *Ante* at 194 n. 4, 854 A.2d at 347 n. 4. Although *Peninsula* addressed negotiability, which is not directly before us, the above discussion demonstrates that that court also resolved questions regarding the dispute's substantive arbitrability. In this regard, the questions addressed in *Peninsula* are no different than the two-step approach applied in *Board of Education of Watertown City School District, supra,* 93 N.Y.2d 132, 688 N.Y.S.2d 463, 710 N.E.2d 1064, a decision that the majority considers "[n]otable." *Ante* at 206, 854 A.2d at 355.

the dispute." *Id.* at 421. Applying that test to the facts before it, the New Hampshire Supreme Court concluded that the teacher was not entitled to arbitrate her non-renewal. It explained:

> The term discharge in Article 9 is clearly used in connection with disciplinary action taken for violation of the board's regulations.... Although we agree with the [union] that as a general proposition, the term discharge may be broad enough to encompass non-renominations, *in the context of this CBA ... the article refers to discharge only in the context of a violation of board rules.*
>
> ....
>
> Although we recognize that only the most forceful evidence will prevent a grievance from going to arbitration where no express CBA provision precludes such action, *AT & T Technologies,* 475 *U.S.* at 650, 106 *S.Ct.* at 1419[, 89 *L.Ed.*2d at 656], the [union] takes the contractual language of the CBA provision it relies on too far out of context for us to conclude that the parties intended to arbitrate this dispute. [*Id.* at 422–23 (emphasis added).]

I agree with the majority that the reasoning of the New Hampshire Supreme Court in *Westmoreland* applies here, particularly the court's reliance on the *Steelworkers* Trilogy to resolve the dispute's arbitrability in the presence of a statute giving the school board authority not to renominate probationary teachers. But the narrow context in which just-cause protection against discipline arose, *i.e.,* only when a board *regulation* was implicated, makes a factual comparison between *Westmoreland* and the case now before this Court tenuous at best. More factually analogous to the present dispute is *Appeal of City of Nashua, School District # 42,* 132 *N.H.* 699, 571 *A.*2d 902 (1990), which the New Hampshire Supreme Court decided just seven months after *Westmoreland* in the face of the same statutory provision.

In *Nashua,* a teacher finishing her third year of service with the school district was non-renewed after the local school board "cited 'serious concerns about [her] attendance record and its impact on instructional continuity.' " *Id.* at 903. Specifically, the board noted that the teacher had taken twenty-six sick days and two and one-half personal days during her preceding two and one-half years of employment. *Ibid.* When the teacher sought to arbitrate her dismissal under a CBA, the board argued that arbitration was foreclosed by *N.H.Rev.Stat. Ann.* § 189:14–a, which, as noted above, only required notice of non-renewal. *Id.* at 905. The

New Hampshire Supreme Court disagreed. Its reasoning is worthy of lengthy treatment:

> [W]e cannot say with positive assurance that the dispute here does not involve the interpretation or application of specific provisions of the CBA.
>
> . . . .
>
> .. The CBA's grievance procedure covers grievances involving an "alleged violation of a term or provision of the existing contract," or a "grievance otherwise arising out of the employer-employee relationship involving wages, hours or other terms or conditions of employment." A disagreement about the use of sick leave is, at least, one involving "other terms or conditions of employment."
>
> . . . .
>
> In *Appeal of Westmoreland School Board*, we held the failure of the Westmoreland School Board to renominate or re-elect a non-tenured teacher in her second year was not grievable pursuant to the collective bargaining agreement. 132 *N.H.* at 109, 564 *A.*2d at 423. *The rationale behind that decision is that the Westmoreland School Board, in failing to renominate or re-elect pursuant to [N.H.Rev.Stat. Ann. § ] 189:14–a, did not implicate a contractual dispute or an alleged violation, misinterpretation, or misapplication of the collective bargaining agreement. Id.* at 108, 564 *A.*2d at 422 . . . . *In contrast, the facts surrounding this case, namely, the declared justification supporting the Nashua School Board's failure to renominate or reelect, necessarily gives rise to genuine issues of contractual interpretation and dispute.* The Nashua School Board, in supporting its decision not to renominate or re-elect on the fact that an employee used twenty-six sick days in two and one-half years, has, if by no more than implication, alleged an abuse of Article VI of the CBA, governing sick leave. Such an alleged abuse of a term or condition of employment requires resolution by the grievance process. To hold otherwise in this case, where a specific benefit accorded a teacher under a CBA is alleged to have been violated by the school board, would presumptively deny probationary teachers the benefits of the contract.
>
> [*Id.* at 905–06 (emphasis added).]

Permitting arbitration of the grievance to proceed, the court explained that whether the board retained its statutory authority not to retain non-tenured teachers was "a matter for the arbitrator to decide [because it] would require [the court] to go beyond determining whether the parties agreed to arbitrate this dispute and would require [the court] to interpret the substantive provisions of the contract." *Id.* at 906 (citing *AT&T Techs., supra*, 475 *U.S.* at 649–50, 106 *S.Ct.* at 1418–19, 89 *L.Ed.*2d at 656).[5]

---

[5] Interestingly, the dissent in *Nashua* took the position espoused by the majority in this case, *i.e.*, statutory authority over non-renewal vested in the

The holdings in *Kaleva, Peninsula,* and *Nashua* illustrate how the present dispute should be resolved. In this appeal, a local board of education, acting in full accordance with its rights under the applicable educational statutes, decided not to renew several employee contracts. However, under a collective agreement reached between the Board and the non-renewed employees, the Board agreed not to discipline any employee without just cause and to arbitrate any employee grievances regarding alleged "violation, misinterpretation or misapplication" of the collective agreement. When the employees alleged that their non-renewals constituted discipline, and that they had been disciplined without just cause, a dispute arose regarding whether or not the agreement between the Board and the employees covered non-renewal decisions. In those circumstances, when there is no express provision excluding non-renewal from the grievance provision of the collective agreement, time-honored and universally recognized arbitration principles that our courts have repeatedly embraced dictate that this Court adhere to the presumption in favor of arbitration and permit the employees' grievances to proceed. It would then be the arbitrator's task to determine if, in view of the agreement and all attendant circumstances, including the education laws, the parties agreed to subject disciplinary non-renewal decisions to a just-cause requirement. To hold otherwise is to deny these employees the benefits of their collective agreement.

The majority's alternative approach to the question of substantive arbitrability, one that creates a presumption against the arbitrability of a dispute in the public sector unless there has been a clearly expressed intent to abrogate an employer's statutory rights, has been expressly rejected by our sister state of New York. *Bd. of Educ. of Watertown City Sch. Dist., supra,* 93 *N.Y.*2d 132, 688 *N.Y.S.*2d 463, 710 *N.E.*2d 1064.

---

school board was not displaced by the arbitration provisions of the collective agreement. 571 *A.*2d at 907. Apparently unmoved by that proposition, the court did not respond to the dissent's contention.

In *Watertown,* the New York Court of Appeals scrutinized two-decades of jurisprudence concerning the "presumptions relating to arbitrability in the public sector [and] the respective roles of courts and arbitrators . . . ." *Id.* 688 *N.Y.S.*2d 463, 710 *N.E.*2d at 1066. Observing that "[a]rbitration in the public arena is no longer unfamiliar or unaccepted," but instead "reality, and . . . is widespread," the court held *"an anti-arbitrational presumption"* to be *"no longer justified either in law, or in the public sector labor environment."* *Id.* 688 *N.Y.S.*2d 463, 710 *N.E.*2d at 1070 (emphasis added). In its stead, the court adopted a "reasonable relationship" test, concluding that courts faced with public-sector arbitration disputes

> should merely determine whether there is a reasonable relationship between the subject matter of the dispute and the general subject matter of the [collective agreement]. If there is none, the issue, as a matter of law, is not arbitrable. If there is, the court should rule the matter arbitrable, and the arbitrator will then make a more exacting interpretation of the precise scope of the substantive provisions of the [agreement], and whether the subject matter of the dispute fits within them[.]

[*Id.* 688 *N.Y.S.*2d 463, 710 *N.E.*2d at 1071.]

Applying that approach to the case before it, the court dissolved an injunction restraining arbitration. *Ibid.* In so doing, it cautioned lower courts to avoid the temptation of deciding the merits of a dispute:

> While some case records contain enough information for a court to make a penetrating analysis of the scope of the substantive provisions of the [collective agreement], an undertaking of that kind is not the function of the court. A judicial inquiry of that sort would involve an inapt flirtation with the merits, or an inappropriate use of the judicial scalpel to split the hairs that mark the perimeters of the contractual provisions. History, legislation, and experience dictate that courts not revert to the business of merits inquiries . . . .

[*Ibid.*]

Prior to today's decision, New Jersey's approach to public sector arbitration was remarkably similar to that prevailing throughout the United States. Until today, a New Jersey court considering arbitrability was limited to determining whether the party seeking arbitration made a claim that, on its face, was covered by the agreement. The presumption lay in favor of arbitration. The majority, however, has chosen to take an opposite approach—

effectively taking a step backwards in modern arbitration practice—by creating a presumption against arbitration of labor disputes in the public sector.

## C.

Jettisoning the modern approach to arbitration in the public sector, the majority deems the present dispute non-arbitrable by venturing onto an uncharted path with regard to substantive arbitrability. It has determined that when faced with the question of whether a particular grievance is substantively arbitrable under a collective agreement, a court's analysis should be informed by "legislative expressions of public policy" that are a "silent factor in every contract[.]" *Ante* at 195, 854 *A.*2d at 347 (internal quotation marks and citations omitted). Applying that standard in ostensible congruence with existing education statutes, it concludes that the collective agreement at issue "does not include the necessary specificity to subject non-renewal of fixed-term employees to arbitral review." *Ante* at 200, 854 *A.*2d at 351. That approach misapprehends the limited function courts should play in resolving arbitrability issues and departs from well-settled principles of substantive arbitrability.

As I understand the majority opinion, it is suggesting that *N.J.S.A.* 18A:17–3, which governs statutory tenure rights for janitorial employees, and *N.J.S.A.* 18A:27–4.1b, which concerns the respective roles of a local board and its Chief School Administrator making personnel decisions, establish the "relative positions" of the parties that must be considered when determining substantive arbitrability. *Ante* at 207, 854 *A.*2d at 355. Because custodial and maintenance employees hired for fixed-terms do not enjoy just-cause protection from non-renewal under those statutes, the majority has denied arbitration. In other words, it has determined that the intent of the parties to arbitrate this griev-

ance is not clear enough in the face of the Board's rights under Title 18A.

To achieve its result, the majority subverts the cardinal principles governing substantive arbitrability. Instead of starting from the presumptive position that disputes arising under arbitration clauses are arbitrable, the majority creates a presumption *against* arbitrability under collective negotiations agreements in the public sector. The majority posits that arbitration should be permitted only when express language in a collective agreement "clearly and unmistakably" demonstrates that the Board has waived its statutory authority concerning non-renewal. *Ante* at 200, 854 *A*.2d at 351. Although that approach is creative, the majority offers no sound reason for such a draconian departure from our prior teachings.

As explained above, four decades of federal and state jurisprudence firmly establish that when a court is asked to make a threshold determination about substantive arbitrability, the starting point—and end point—of the inquiry is the contract. *See, e.g., Standard Motor Freight, supra,* 49 *N.J.* at 96, 228 *A*.2d 329 ("[The court] 'is confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract.' ") (quoting *Am. Mfg. Co., supra,* 363 *U.S.* at 567–68, 80 *S.Ct.* at 1346, 4 *L.Ed.*2d at 1407); *Jersey Cent. Power & Light Co., supra,* 38 *N.J.* at 105, 183 *A*.2d 41 (same); *Bd. of Educ. of the Twp. of Bloomfield, supra,* 251 *N.J.Super.* at 384, 598 *A*.2d 518 (same); *Cohen v. Allstate Ins. Co.,* 231 *N.J.Super.* 97, 101, 555 *A*.2d 21 (App.Div.1989) ("[T]he duty to arbitrate . . . and the scope of the arbitration . . . are dependent solely on the parties' agreement. The parties may shape their arbitration in any form they choose and may include whatever provisions they wish to limit its scope.") (citations omitted), *certif. denied,* 117 *N.J.* 87, 563 *A*.2d 846 (1989); *Clifton Bd. of Educ. v. Clifton Teachers Ass'n,* 154 *N.J.Super.* 500, 503, 381 *A*.2d 1226 (App.Div.1977) ("The duty to arbitrate springs from contract, and the parties can only be compelled to arbitrate those matters which are within the scope of the arbitration clause of their contract."); *cf. State v. Int'l Fed'n of Prof'l and Technical Engrs., Local 195,* 169 *N.J.* 505, 542, 780 *A*.2d 525 (2001) (LaVecchia, J., dissenting) (explaining that when

determining arbitrator's authority to resolve contractual disputes, "[t]he starting point for [a court's] analysis ... is the language of the parties' agreement").

Once the court determines that the party seeking arbitration makes a claim that on its face is within the scope of the contract's arbitration clause, its inquiry is at an end; the underlying question whether the agreement provides the disputed protections presents a merits question that the parties have agreed to resolve through arbitration. Put differently, as the New York Court of Appeals explained in repudiating the approach presently adopted by the majority, "[a] court confronted with a contest of this kind should merely determine whether there is a *reasonable relationship* between the subject matter of the dispute and the general subject matter of the [collective agreement]." [6] *Watertown, supra,* 688 *N.Y.S.*2d 463, 710 *N.E.*2d at 1071 (emphasis added).

Whether framed as bringing a claim that is covered "on its face" by the contract or as bearing a "reasonable relationship" to the agreement, a dispute implicating the scope of an arbitration provision, and any ambiguity therein, must be resolved in favor of coverage. *Standard Motor Freight, supra,* 49 *N.J.* at 96, 228 *A.*2d 329 (quoting *Warrior & Gulf Nav., supra,* 363 *U.S.* at 582–83, 80 *S.Ct.* at 1353, 4 *L.Ed.*2d at 1417–18). Thus, although educational statutes might provide a "statutory backdrop" in circumstances not involving a collective negotiation agreement, *ante* at 200, 854 *A.*2d at 351, those statutes have no relevance to the substantive

---

[6] Although the majority correctly observes that the court in *Watertown* did not expressly adopt a presumption in favor of arbitrability, *ante* at 206, 854 *A.*2d at 355, the reasonable-relationship test is as broad as, if not broader than, such a presumption; not only are all doubts resolved in favor of coverage under such an approach, but the task of interpreting the specific contract language at issue is taken completely out of the hands of the court and left for an arbitrator. 688 *N.Y.S.*2d 463, 710 *N.E.*2d at 1071. Accordingly, the reasonable-relationship test can be analogized to the approach adopted in *Bloomfield, supra:* a matter must be sent to arbitration if the dispute, on its face, falls within the arbitration provision of the collective agreement. 251 *N.J.Super.* at 384, 598 *A.*2d 518.

arbitrability of a dispute. *Cf. State Supervisory Employees Ass'n, supra,* 78 *N.J.* at 81, 393 *A.*2d 233 ("A contractual provision affording the employees rights or benefits in excess of that required by statute or regulation is valid and enforceable.").

To adopt the majority's more stringent standard of review, one that demands "clear[ ] and unmistakabl[e]" proof of an intent to arbitrate a particular dispute, *ante* at 200, 854 A.2d at 351, essentially requires the court to resolve the merits of the underlying claim. Such an approach to substantive arbitrability effectively casts arbitration law back to the 1940s, a time before arbitration was widely accepted and when courts were hesitant to allow arbitrators to play a role that had been typically reserved for courts, namely, contract interpretation. In short, the majority's newly fashioned process of viewing agreements through the prism of existing statutory law is an attempt to discern the intent of the parties at the time they formed their agreement. Discerning that intent in this case, however, requires a court to delve impermissibly into the merits of the dispute and disrupts the settled expectations of the parties.

To best honor the parties' intention that a dispute arising out of their agreement be resolved through arbitration, this Court must limit its inquiry to the substantive arbitrability of a dispute and allow an arbitrator to decide the merits of the claim, because the arbitrator is the person charged with resolving the parties' intent. As the United States Supreme Court explained in the *Steelworkers* Trilogy, "Whether the [party moving for arbitration] is right or wrong is a question of contract interpretation for the arbitrator. ... [T]he moving party should not be deprived of the arbitrator's judgment, when it was his judgment and all that it connotes that was bargained for." *Am. Mfg. Co., supra,* 363 *U.S.* at 568, 80 *S.Ct.* at 1346, 4 *L.Ed.*2d at 1407.

In this case, the parties have agreed that an employee's complaint is arbitrable if it involves a claim of "personal loss, injury or inconvenience because of a violation, misinterpretation or misappli-

cation of the Agreement" and that an arbitrator resolving that claim "shall limit himself/herself to the issue submitted to him/her and shall consider nothing else. He/she can add nothing to, nor subtract anything from, the Agreement between the parties or any policy of the Board of Education." The employees have pointed to two separate provisions of the agreement, Articles IV and XII, alleging that the Board caused them a personal loss or injury by violating, misinterpreting, and/or misapplying those provisions. In view of those claims, both of which undeniably bear a reasonable relationship to the contract, the majority's determination that the employees have not made a claim on its face covered by the arbitration clause of the collective agreement, at the very least, strains credulity.

In addition, I note that the majority's reliance on *Marlboro Township Board of Education v. Marlboro Township Education Ass'n,* 299 *N.J.Super.* 283, 690 *A.2d* 1092 (App.Div.), *certif. denied,* 151 *N.J.* 71, 697 *A.2d* 544 (1997), to justify its approach to the present dispute is misplaced. In that case, the board had expressly adopted a policy declaring that "annual renewal is a prerogative of the board" and the collective agreement between the board and the union provided that the board's authority, including policies adopted by the board, was "limited only by the *specific and expressed* terms" of the agreement. *Id.* at 285, 690 *A.2d* 1092 (emphasis added). In the face of that language, the Appellate Division determined that the Board's decision to non-renew a bus driver could not be reviewed under a collective agreement because the board had "exercised a clearly enunciated *contractual* right not to renew[.]" [7] *Id.* at 286, 690 *A.2d* 1092 (emphasis added). In

---

[7] Notably, the court in *Marlboro* found the circumstances before it "markedly different from" those it confronted in *Hunterdon Central Regional High School Board of Education v. Hunterdon Central Bus Drivers Ass'n,* 21 *NJPER* ¶ 26030 (App.Div.), *certif. denied* 140 *N.J.* 277, 658 *A.2d* 301 (1995). 299 *N.J.Super.* at 286, 690 *A.2d* 1092. In that decision, the court expressly stated that "a school board may agree to extend contractual tenure to a non-professional employee such as a bus driver by a promise to continue his or her employment absent just cause for termination or renewal" and concluded the question of whether the

the present dispute, the Board did not adopt such a policy or expressly reserve non-renewal decisions from the grievance provisions of the collective agreement. Accordingly, the matter must be submitted to arbitration because we cannot state with positive assurance that the parties did not intend to subject disciplinary non-renewal decisions to arbitral review.

Contrary to the majority's suggestion, there is nothing incongruous about submitting the present dispute to arbitration in the face of the "narrow" language of the agreement's arbitration clause. *Ante* at 207, 854 *A*.2d at 355. The majority's misreading and misuse of that term requires additional clarification.

Arbitration clauses have been loosely categorized by some courts as "broad" or "narrow." *See, e.g., Communications Workers of Am., Local 1087 v. Monmouth County Bd. of Soc. Servs.*, 96 *N.J.* 442, 450, 476 *A*.2d 777 (1984); *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.*, 252 *F*.3d 218, 224 (2d Cir.), *cert. denied*, 534 *U.S.* 1020, 122 *S.Ct.* 546, 151 *L.Ed*.2d 423 (2001). Although the arbitration clause at issue here does not contain the unqualified broad language that makes all disputes "arising out of" or "related to" the contract arbitrable, it is broad in both its common-sense meaning and its legal effect. The right to arbitration exists for any "violation, misinterpretation or misapplication of th[e] Agreement." That is the classic language of a broad arbitration clause, and experience demonstrates that the vast majority of agreements in both the private and public sectors contain that or similar language. *See, e.g., Chicopee, supra,* 721 *N.E*.2d at 386 (characterizing "disputes or misunderstandings concerning application or interpretation of agreement" as broad arbitration clause) (citing *Wilmington v. Wilmington Firefighters Local 1590*, 385 *A*.2d 720, 722 n. 1 (Del.1978)). Here the language is qualified only by the fact that there must be "a personal loss,

---

board had done so was "one for the arbitrator." *Ibid.* (quoting *Hunterdon, supra* ). That reasoning would seemingly apply here.

injury or inconvenience" to the grievant. And that is not a meaningful limitation at all because a "loss, injury or inconvenience" is the *sine qua non* of a grievance. Thus, it cannot be said that this clause is "narrowly crafted." *Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs,* 982 *F.*2d 884, 888 n. 5 (3d Cir.1992) (describing arbitration provision applying "only to *certain* disciplinary discharges and layoffs" as "narrowly crafted") (emphasis added); *see, e.g., Howard County Bd. of Educ. v. Howard County Educ. Ass'n,* 61 *Md.App.* 631, 487 *A.*2d 1220, 1222, 1225 (1985) (construing clause applying to "interpretation, application or alleged breach of any of the provisions of th[e] Agreement" as neither "extremely broad" nor "narrow").

Even if this arbitration clause is labeled "narrow," however, the presumption of arbitrability still applies. As the Fifth Circuit has explained, applying the presumption of arbitrability only to broad arbitration clauses "would render the presumption of little value as a rule of construction: we would first have to determine that the arbitration clause is 'broad' enough to cover all contractual disputes, and only then apply the presumption (when it is no longer needed)." *Int'l Bhd. of Elec. Workers, Local 2188 v. W. Elec. Co.,* 661 *F.*2d 514, 516 n. 3 (1981); *see also Ivax Corp. v. B. Braun of Am., Inc.,* 286 *F.*3d 1309, 1320 n. 23 (11th Cir.2002) (rejecting argument that "presumption of arbitrability" is inapplicable when narrow arbitration clause is involved); *Wash. Mailers Union No. 29 v. Wash. Post Co.,* 233 *F.*3d 587, 592 n. 4 (D.C.Cir. 2000) ("While the fact that the arbitration clause in this case is not broad—limiting grievances to allegations of 'violation of a specific provision of this Agreement'—is relevant to our inquiry, it does not negate the presumption of arbitrability."); *Federated Metals Corp. v. United Steelworkers of Am.,* 648 *F.*2d 856, 860 (3d Cir.) (concluding that "even when the arbitration clause is narrow, doubts should be resolved in favor of arbitration"), *cert. denied,* 454 *U.S.* 1031, 102 *S.Ct.* 567, 70 *L.Ed.*2d 474 (1981). *But see Salary Policy Employee Panel v. Tennessee Valley Auth.,* 868 *F.*2d 872, 877 (6th Cir.1989) (concluding presumption of arbitrability not applicable to narrowly drawn arbitration clause). The

majority's position, that the grievance is not arbitrable because there is no express provision of the agreement modifying (what it perceives to be) an overriding statutory scheme, *ante* at 195, 854 *A*.2d at 347, is improper because it amounts to a determination of the merits of the dispute.

To reiterate, in determining whether a dispute is arbitrable, the court must consider whether the conduct at issue is "on its face" within the purview of the clause. "Whenever the scope of an arbitration clause is fairly debatable or reasonably in doubt, the court should decide the question of construction in favor of arbitration." *In re Complaint of Hornbeck Offshore (1984) Corp.*, 981 *F*.2d 752, 755 (5th Cir.1993) (quotations and alterations omitted). In the instant case, the parties dispute whether, under their agreement, a grievance over non-renewal was intended to constitute a disciplinary action. Thus, the contract is reasonably debatable "on its face" and is properly the subject of arbitration.

By reaffirming the principles of substantive arbitrability, I am not suggesting that the existing statutory framework is irrelevant to the parties' *underlying* dispute. Quite the contrary is true. In determining whether the collective negotiation agreement encompasses the non-renewal decision, the *arbitrator* will look to the existing law and consider whether the Board and the employees intended the agreement to include non-renewal as a form of discipline in view of *N.J.S.A.* 18A:27–4.1b. *Cf. New Jersey Turnpike Auth. v. New Jersey Turnpike Supervisors Ass'n,* 143 *N.J.* 185, 198, 670 *A*.2d 1 (1996) ("In the public sector, the public interest, welfare, and other pertinent statutory criteria are inherent in the standards that inform and govern public sector arbitration."); *Silverstein v. Keane,* 19 *N.J.* 1, 12, 115 *A*.2d 1 (1955) (explaining that when ascertaining parties' intent, consideration may be given to statutes as indicia of "attendant circumstances and conditions" that shed light on parties' reasonable expectations in entering agreement). Nor am I suggesting that the collective agreement "include[s] the necessary specificity to subject non-renewal of fixed term employees to arbitral review." *Ante* at 200,

854 *A.*2d at 351. The question of what the parties negotiated is not before us. The only question we should resolve is whether the language of this agreement's arbitration clause permits the parties to bring their grievance to an arbitrator. We should resolve that question in the affirmative, leaving to the arbitrator the task of ascertaining the intent of the parties. By so doing, we would defer to the terms the parties themselves have negotiated in this agreement.

## D.

The principles contained in our decisional law require arbitration of the present dispute. As noted, the jurisprudence of our sister states is to the same effect. Policy considerations reinforce the view that arbitration should be permitted to proceed.

To begin, our Constitution recognizes that "[p]ersons in public employment shall have the right to organize, present to and make known to the State, or any of its political subdivisions or agencies, their grievances and proposals through representatives of their own choosing." *N.J. Const.* art. I, ¶ 19. The New Jersey Employer–Employee Relations Act, *N.J.S.A.* 34:13A–1 to –30, which addresses the rights and responsibilities of employees and employers in the public sector, implements that constitutional mandate. In its "Declaration of Policy," the Act states that it is

> *the public policy* of this State that the best interests of the people of the State are served by the prevention or prompt *settlement* of labor disputes, both in the private and *public* sectors .... *To carry out such policy,* the necessity for the enactment of the provisions of this act is hereby declared as a matter of legislative determination.
>
> [*N.J.S.A.* 34:13A–2 (emphasis added).]

In turn, the Act also specifically requires public employers to negotiate grievance and disciplinary review procedures, *N.J.S.A.* 34:13A–5.3, and provides that those procedures "shall be deemed to *require* binding arbitration as the terminal step with respect to disputes concerning imposition of reprimands and *discipline* as that term is defined in [the Act]." *N.J.S.A.* 34:13A–29 (emphasis added). Importantly, under *N.J.S.A.* 34:13A–22, the Act broadly

defines the term "discipline" to include "all forms of discipline" with narrow exceptions not applicable here. Thus, public policy in the form of manifest legislative intent favors public-sector arbitration of labor disputes in general, and disputes regarding discipline in particular.

More recently, both the legislative and executive branches of our government have expressed their desire that public-sector labor arbitration continue to adhere to the principles first espoused in the *Steelworkers* Trilogy. In 2002, a modified version of the Uniform Arbitration Act of 2000 was introduced in the Senate. *Senate Bill No. 514* (Jan. 8, 2002). The primary purpose of the bill was "to advance arbitration as a desirable alternative to litigation and to clarify arbitration procedures in light of the developments of the law in this area." Senate Judiciary Committee, *Statement to Senate Bill No. 514,* at 1 (May 9, 2002). After the bill passed in both houses, Governor McGreevey conditionally vetoed the measure and returned it to the Senate with recommended amendments. *Governor's Veto Message to Senate Bill No. 514,* at 1 (Mar. 10, 2003). Significantly, his reasons for returning the bill for reconsideration reveal his concern that the "bill could lead to the introduction of new issues, specifically with regard to the labor relations process between employers and employees, that are not warranted." *Id.* at 1–2. He explained:

I have … been assured by the bill's sponsors and by interested parties that the bill was not intended to modify existing practice and procedure with respect to labor arbitrations. Arbitration of disputes arising from collective bargaining agreements has quite different functions from arbitration under an ordinary agreement to arbitrate commercial disputes. Since a series of cases known as the "Steelworkers trilogy," the Supreme Court of the United States has consistently shown that the federal policy in labor practice is to "promote industrial stabilization through the collective bargaining agreement."

. . . .

*Although the Steelworkers Trilogy originated in the private sector, the same principles have been applied in the public sector. New Jersey has embraced and applied the Steelworkers Trilogy principles of favoring arbitration in public sector labor relations.* In the public labor sector, arbitration is also favored and is commonly utilized to settle labor-management disputes. The policy favoring arbitration in the public sector is also supported by the fact that public employees do not have the right to strike, as do private sector employees. Therefore, negotiation

and arbitration constitute the primary method of resolving disputes with management.

This system of industrial justice has meaningfully evolved to reach the current status of maintaining labor stability through collective negotiations. *Considering the significance and distinctive nature of arbitration in promoting labor stability, placing a new body of law, however deemed beneficial, in lieu of the traditionally acknowledged manner of labor practice, is more than likely to disturb the environment that has been mutually accepted as the labor relations process for decades.*

Accordingly, it is recommended that the bill should be implemented with the sole exception of exempting arbitration between employers and employees under collective bargaining agreements.

[*Id.* at 2 (internal citations omitted) (emphasis added).]

With that message in hand, the Legislature enacted the Governor's proposed changes and unanimously approved the revised bill. As modified, the Governor signed the measure into law in June 2003. *L.* 2003, *c.* 95. Thus, both our legislative and executive branches have acknowledged the importance of applying the principles of the *Steelworkers* Trilogy in the public sector. *See Oswin v. Shaw,* 129 *N.J.* 290, 308, 609 *A.*2d 415 (1992) (recognizing that adoption of legislation with amendments in response to conditional veto renders conditional veto message "strong evidence of legislative intent") (internal quotation marks and citation omitted).

Finally, my adherence to the fundamental principles of labor arbitration, which allows the employees' claims in this appeal to proceed to arbitration, takes into account policy considerations favoring public employers. The statutory right of public employers not to renew a non-tenured employee for both disciplinary and non-disciplinary reasons is not in doubt. When there is no collective agreement in place, public employers have the right not to renew a non-tenured employee for any non-discriminatory reason, so long as that action is not arbitrary or capricious. *N.J.S.A.* 18A:27–4.1b. Further, employers and employees may negotiate language clarifying that non-renewal decisions are excluded from arbitration even when there *is* a collective negotiation agreement providing protections against discipline. *See infra* at 241–42, 854 *A.*2d at 376–77. But those rights do not override the

deference courts must accord to the terms the parties themselves have negotiated.

Good policy combined with bedrock principles of collective negotiations and arbitrability all require that a neutral, third-party arbitrator should decide disputes when disagreements implicate the terms of a collective negotiations agreement. Otherwise, hard-won concessions attained by both employers and employees through collective negotiations will become little more than hollow rights.

## IV.

There is a more sensible and fair manner to resolve this dispute. My view is not meant to imply that the parties cannot agree that non-renewals are not arbitrable. Precisely the opposite is true. Should they desire, the parties may exclude the non-renewal of non-tenured, non-professional employees from arbitration.

The present contract language permits the dispute before us to proceed to an arbitrator for further proceedings. If, in the future, the parties wish to ensure that non-renewal decisions are excluded from arbitration despite just-cause or similar protections against discipline, they could say so in no uncertain terms. *See, e.g., Watertown, supra,* 688 *N.Y.S.*2d 463, 710 *N.E.*2d at 1070 ("Parties are likewise free to negotiate exclusions, and to word arbitration clauses with sufficient clarity for a court to be able to tell, on a threshold determination, whether they intended a permissible subject or type of dispute to be arbitrable or not."). I reject the majority's view that the agreement must specifically *include* non-renewals in the arbitration clause in order for the matter to be arbitrable as a grievance. If we place the burden on the parties to include every grievance that is arbitrable, there will be disputes, *ad infinitum,* that the subject matter of a particular grievance was not identified specifically in the contract. *See Warrior & Gulf Nav., supra,* 363 *U.S.* at 578–79, 80 *S.Ct.* at 1351, 4 *L.Ed.*2d at 1415 (describing collective agreement as "a generalized code to govern a myriad of cases which the draftsmen cannot wholly

anticipate"). In addition, the majority's arcane approach, like so much else in its opinion, runs afoul of the United States Supreme Court's admonition that "[i]n the absence of any *express provision* excluding a particular grievance from arbitration, ... only the most forceful evidence of a purpose to *exclude* the claim from arbitration can prevail ...." *Id.* at 584–85, 80 *S.Ct.* at 1354, 4 *L.Ed.*2d at 1419 (emphasis added).

In sum, applying the presumption in favor of arbitration while allowing parties to expressly exclude individual matters accommodates the interest of public employers and employees, and remains in concert with the applicable statutes, decisional law, and policy concerns. Under that approach, these janitors may or may not have been awarded back their jobs but at least they would have received precisely what the parties contracted for: a determination of their grievance by a neutral third-party. Moreover, this Board and future boards would have a roadmap to avoid the recurrence of this problem. Almost a half-century of law and sound policy would remain intact, and the public would be protected. Such a simple approach would avoid the problems the majority opinion now creates, including the rise in litigation that will undoubtedly follow as a result of its decision—which is precisely what arbitration was designed to prevent.

## V.

Finally, I note that the majority, in an attempt to justify its conclusion that the present dispute is not arbitrable, reasons it would be "counterintuitive" to send this dispute to arbitration because " 'a disciplinee should be accorded no greater rights than those accorded to a faultless non-renewed employee.' " *Ante* at 201, 854 *A.*2d at 351 (quoting *Cresskill Bd. of Educ. v. Cresskill Educ. Ass'n,* 362 *N.J.Super.* 7, 15, 826 *A.*2d 778 (App.Div.2003), *certif. pending* (2004)). That statement warrants two observations.

First, as this Court explained in a similar context, although an agreement that requires an employer to grant a hearing to an

employee when the employer has the right to fire an employee for no reason "may seem counter-intuitive," the place to remedy "a bad deal" is at the bargaining table, not in court. *Office of Employee Relations v. Communications Workers of Am.,* 154 *N.J.* 98, 115, 711 *A.*2d 300 (1998). Merely because a system of employee protections appears anomalous is no reason to conclude that the Board did not agree to it.

Second, and more important, the majority's concern has nothing to do with substantive arbitrability; the propriety of such a provision goes to the merits of this dispute. By effectively determining the protections that it believes the parties should and should not be allowed to negotiate, the majority has allowed the merits of this dispute to seep impermissibly into the determination of substantive arbitrability.

If the majority feels compelled to address the merits of this grievance, there exists a record and a history in this case, of which the majority is aware, that demonstrate that the Board's actions constituted discipline (and are thus arbitrable under the parties' agreement). That record reveals that a Board representative sent each employee a letter stating that *"disciplinary action,"* including "not being recommended for reappointment," *i.e.* non-renewal, was a possible consequence of what the Board perceived to be "excessive absenteeism" on the part of these employees. More important, as detailed above, the arbitrator that heard Derek Copeland's grievance, after a full hearing and fair opportunity for all sides to present their case, concluded that the Board "viewed the non-renewal as an ultimate disciplinary penalty" and that its intent to discipline Copeland "could not have been clearer." In addition, he noted that there was "a scent of bad faith" in the Board's conduct.

The Board's letters and the arbitrator's findings are cited not to delve into the merits of the present dispute. I have already set out principled reasons, applying the teachings of the *Steelworkers* Trilogy, explaining why this matter should proceed to arbitration regardless of which party might prevail. Rather, the record is

relevant here because, arguably in the face of "bad faith" on the part of the Board, the majority grants equitable relief to a party undeserving of aid. The majority has chosen to ignore the reality that the termination of these employees, in the context of a non-renewal, may well be little more than a pretext for the imposition of a disciplinary penalty. To allow these fifteen custodial and maintenance employees to lose their jobs after many years of service to their employer, to deny them the opportunity simply to be heard by a neutral arbitrator in the face of the Board's conduct, does more than repudiate precedent. It results in an injustice.

## VI.

Arbitration should be allowed to proceed in this appeal because the matter is both negotiable and substantively arbitrable. The approach to substantive arbitrability I have recounted accords with decades of jurisprudence and with the present practices of our sister states. It requires the Court to honor the intention of these parties to submit to an arbitrator grievances regarding the substance of their agreement. Because the majority's opinion represents an unwarranted departure from fundamental labor-law principles, does violence to the settled expectations of the parties, and works an apparent injustice on fifteen employees, I dissent.

Justices LONG and ALBIN join in this opinion.

*For reversal*—Chief Justice PORITZ and Justices VERNIERO, LaVECCHIA and PETRELLA—4.

*Dissent*—Justices LONG, ZAZZALI and ALBIN—3.